RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0303p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

AMANDA N. REICH; ELISE DAVIDSON, Successor
Administratrix of Estate of Joshua Steven Blough,

*Plaintiffs-Appellants*,

*v.*

CITY OF ELIZABETHTOWN, KENTUCKY; MATTHEW
MCMILLEN; SCOT RICHARDSON,

*Defendants-Appellees*.

No. 18-6296

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:16-cv-00429—Rebecca Grady Jennings, District Judge.

Argued: July 31, 2019

Decided and Filed: December 19, 2019

Before: MOORE, COOK, and THAPAR, Circuit Judges.

---

## COUNSEL

**ARGUED:** Robert L. Astorino, Jr., STEIN WHATLEY ATTORNEYS, PLLC, Louisville, Kentucky, for Appellants. Jason B. Bell, BELL, HESS & VAN ZANT, PLC, Elizabethtown, Kentucky, for Appellees. **ON BRIEF:** Robert L. Astorino, Jr., Matthew W. Stein, STEIN WHATLEY ATTORNEYS, PLLC, Louisville, Kentucky, for Appellants. Jason B. Bell, BELL, HESS & VAN ZANT, PLC, Elizabethtown, Kentucky, D. Dee Shaw, Elizabethtown, Kentucky, for Appellees.

COOK, J., delivered the opinion of the court in which THAPAR, J., joined. MOORE, J. (pp. 19–29), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

COOK, Circuit Judge.  En route to a mental health treatment facility, Joshua Blough got out of his fiancée's vehicle holding his knife, walked through traffic, and wandered into a residential neighborhood.  When he ignored his fiancée's repeated pleas to get back in the car, police officers intervened.  After he refused commands to drop the knife, the officers fired three shots, killing Blough.  His fiancée and his estate sued under federal and state law, claiming that the officers used excessive force by shooting Blough.  Because the officers' use of deadly force was objectively reasonable under the Fourth Amendment, we hold that qualified immunity shields the officers and AFFIRM the grant of summary judgment.

**I.**

On July 6, 2015, Joshua Blough sought help at a Communicare mental health facility in Leitchfield, Kentucky.  During his evaluation, he reported having auditory hallucinations (thinking television shows were talking to him) and paranoia.  He told evaluating staff that he'd stopped taking his prescribed schizophrenia medication about four months earlier.  Blough also reported three suicide attempts in the past two weeks, most recently five days earlier, but denied current suicidal ideation.  A Communicare therapist recommended psychiatric hospitalization and arranged for Blough to voluntarily admit himself at a mental health facility nearby the next day.

In the morning, Blough's fiancée, Amanda Reich, began the drive to the facility.  Blough sat in the passenger seat and Reich, who had accompanied Blough to Communicare the previous day, took the wheel.  About halfway into the trip, Blough saw a Kentucky State Police vehicle stopped on the side of the road.  High on methamphetamine, Blough became "really upset" and started hallucinating, remarking that "there were police officers everywhere."  Hoping a different road might calm Blough, Reich exited to take the highway.

When they later stopped at a traffic light, Blough pulled out his three-inch knife, opened the blade, and jumped out of the car.  Though they had not seen any other police officers, Blough

climbed out and told Reich, "I'm not gonna let anybody hurt you but I'm not gonna let anybody hurt me either." Reich replied that there were no police around, and that Blough needed to get back in the car so he could get help. Blough complied but left the knife—blade open and locked—on his lap.

When they stopped at another red light, without a word, Blough got out of the car with the knife. And this time he would not get back in. Blough took off on foot through traffic and walked to an empty field behind a residential neighborhood. Reich said that "it was like when he was walking he wasn't even acknowledging any cars coming by or nothing." Unable to "do anything with him," Reich dialed 911. She worried that, because Blough had a knife, "somebody else would get the wrong idea and call in thinking that [Blough] was a threat to someone and that he would end up getting shot."

Reich told the dispatcher that Blough had "schizophrenia real bad," had not been taking his medication, had a knife, and thought "everybody [was] out to get him." The dispatcher relayed that information by radio to the Elizabethtown Police Department; Officer McMillen heard the message and responded. The dispatcher then connected Reich directly to Officer McMillen, who arrived at the scene "three or four minutes" later to conduct a welfare check. During that short window of time, Reich herself got out of the car and asked Blough to get back in and put down the knife, but he refused.

With Officer McMillen now at the scene, Reich told him the information she shared with the dispatcher. Reich let the officer know that she thought it would be better if she "could handle it on [her] own," that Blough did not like the police, and that a Kentucky State Police officer shot him a few years ago. Officer McMillen agreed to let Reich try to get Blough back in the car and explained that, given Blough's paranoid state, "he could perceive [officers] as a threat and act upon it, especially if he's armed with a knife." He told Reich that police were "not going to actively search for [Blough]" and returned to his car.

Once there, Officer McMillen advised dispatch of his discussion, including that officers should not actively look for Blough because "if [they] . . . did find him, there was a potential for it to go bad." He then drove away to make sure Blough had not entered the roadway. Around

that time, Officer Richardson, from his car in a church parking lot, saw Blough—now in the neighborhood—"acting bizarre." He had his shirt off, pacing between houses, carrying something in his hand. Officer Richardson radioed Officer McMillen, who informed him that Blough had a knife. Officer McMillen then circled back toward the scene.

Now alone, Reich pulled into the subdivision and set out on foot to go reason with Blough. As she approached him, however, she realized that he "must have seen the police . . . talking to [her]" and "thought that [she] was involved in trying to get him hurt, too." He again refused to return to the vehicle or put the knife down. Reich walked back to her car "to pull it up and park," and saw the police coming down the road. When the officers pulled up (no lights or sirens), Reich requested another chance to get Blough to put down the knife—neither officer responded, but neither tried to stop her. Blough then began walking toward the group.

Reich approached Blough for a second time, now in a neighbor's front yard. She asked him the same two questions for "probably" the tenth time, and he gave the same answer to each: no. At that point, the officers had stepped out of their cars and "were just standing by" near their vehicles, which were parked on the neighborhood street in front of single-family homes. They then "told [Reich] to get out of the way."

According to Reich, the officers next ordered Blough "to put the knife down" in a "very firm, loud tone." In response, Blough "took a step forward toward them" with his knife raised in his right hand in a stabbing position. And—again according to Reich—before or after this step, Blough told one of the officers, "you're gonna have to kill me mother ****er." Reich says Blough then "turned around" and took "one or two steps" before the officers fired.

Both officers and three independent eyewitnesses disagree that Blough turned around. They all say that, at the time the officers fired, Blough was walking at a fast pace toward Officer Richardson; all but one stated that Blough had the knife in his right hand. *See* R. 61-14, Richardson Depo., PageID 4600; R. 61-11, McMillen Depo., PageID 2372, 2384–85; R. 55-11,

PageID 823; R. 55-14, PageID 829; R. 55-17, PageID 839.[1]  As for Reich, she testified that she did not remember whether Blough "ever raised his arm with his knife in it towards the officers."

Officer Richardson fired two shots in rapid succession and Officer McMillen fired once; two of those three shots hit Blough, who fell face down in the grass.  Both officers administered first aid, but Blough died shortly after.

Reich and the administratrix of Blough's estate brought this suit under 42 U.S.C. § 1983 against the City of Elizabethtown and both officers,[2] alleging Fourth and Eighth Amendment violations, along with various state tort claims.  After discovery concluded in February 2018, the City and officers moved for summary judgment.  Plaintiffs filed a response that included an affidavit from Reich attesting—unlike her deposition—to the distance between Blough and the officers when they fired.  The district court disregarded the affidavit and granted summary judgment for defendants, holding that qualified immunity shielded them from liability.  This appeal followed.

**II.**

We review de novo a district court's grant of summary judgment on qualified immunity grounds.  *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).  A court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When the movant carries this burden, the burden shifts to the opposing party, who must come forward with "specific facts showing that there is a genuine issue for trial."  *Haddad v. Gregg*, 910 F.3d 237, 243 (6th Cir. 2018).  No genuine issue exists when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Courts "must construe the evidence and draw all

---

[1]One of those eyewitnesses wrote in her initial statement for the Kentucky State Police that she thought "[Blough] was going to try to get away."  R. 61-10, PageID 2262.  But her affidavit says the opposite. R. 55-11, PageID 823 ("[Blough] was still moving toward the officers and was close to them when they drew their guns and shot him.").

[2]This suit also named Tracy Shiller, Chief of the Elizabethtown Police Department, as a defendant.  But the parties later agreed to dismiss all claims against him.

reasonable inferences in favor of the nonmoving party." *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2008).

## III.

## A.  Reich's Affidavit

We start with Reich's affidavit.  We review a court's "refusal to consider an affidavit filed as an appendix to a motion in opposition of a motion for summary judgment for an abuse of discretion." *Myers v. Huron Cty.*, 307 F. App'x 917, 918 (6th Cir. 2009); *Briggs v. Potter*, 463 F.3d 507, 511 (6th Cir. 2006).  The district court declined to consider Reich's affidavit, filed with her response to the defendants' motion for summary judgment (more than two months after discovery closed), because it contradicted her sworn deposition testimony.  Reich sees it differently, arguing her affidavit actually closely mirrors her deposition testimony and simply clarifies issues that she could not answer precisely.  On this record, we cannot say that the district court abused its discretion in assessing the two as contradictory.

"A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).  At summary judgment, to evaluate a post-deposition affidavit's admissibility, we ask first whether the affidavit "directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).  If so, absent a persuasive justification for the contradiction, the court should not consider the affidavit. *Id.*  But if no direct contradiction exists, "the district court should not strike or disregard th[e] affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

Our precedents suggest "a relatively narrow definition of contradiction." *Briggs*, 463 F.3d at 513.  If a party "was not directly questioned about an issue," a later affidavit on that issue simply "fills a gap left open by the moving party." *Aerel*, 448 F.3d at 907.  After all, deponents have no obligation to volunteer information the questioner fails to seek. *Id.*; *see Briggs*, 463 F.3d at 513 (holding that a party has no obligation to volunteer the content of a

conversation when deponent "was not expressly asked" what another said to him). But a deponent may not "duck her deposition" or "hold her cards in anticipation of a later advantage." *Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 353 (6th Cir. 2013). Where a deponent is "asked specific questions about, yet denie[s] knowledge of, the material aspects of her case, the material allegations in her affidavit directly contradict her deposition." *Id.*; *see Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984) (citation omitted) ("If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.").

At her deposition, when first asked if she could estimate the distance between the officers and Blough, Reich responded that she could not—"[I]'m not sure . . . . I don't want to guess about it." R. 55-5, PageID 614. But she later guessed that Blough "was probably 20 feet [away] when he took a step toward them." *Id.* After more probing about the distances, Reich's attorney intervened, telling Reich that "if [she] fe[lt] comfortable with the distances" she could testify to that, but that she should not guess. *Id.*, PageID 615. Reich then gave her final answer: "Yeah, I don't feel comfortable with the -- the estimated length of -- you know, I don't feel comfortable with it. Because it's been a long time and I just don't feel comfortable with estimating on that." *Id.* And the exchange ended with a definitive answer from Reich, removing any doubt as to her testimony on the issue:

> Q: So your testimony is you have no idea how far [Blough] was from the officers when he was shot.
>
> A: Right. But he was far enough that he wasn't a threat to them.
>
> Q: Okay. But you have no idea how far he was when he was shot.
>
> A: No.

*Id.*

Almost a year to the day later, Reich's affidavit swore something different. She asserted that once she returned to the scene of the shooting in April 2018—over two months after discovery closed—she accurately recalled where all four stood when the officers fired on Blough. So nearly three years after the shooting she measured and recorded the distances

between them.  She placed the distance between Blough and Officer Richardson—who fired the first shot—at just over twenty-five feet.  Her measurements put Officer McMillen over thirty-six feet away from Blough.  And she placed herself thirty-four-and-a-half feet from him.

Reich's affidavit plainly contradicts her deposition testimony.  Counsel asked several times for her recollection regarding the distance between Blough and the officers.  In the face of this direct and thorough questioning, Reich said that she did not know.  Her affidavit, asserting that she *does know*, therefore contradicts.  *Powell-Pickett*, 549 F. App'x at 353; *see Reid*, 790 F.2d at 459–460 ("If such a statement had been made, she was required to bring it out at the deposition[.]"); *Myers v. Huron Cty.*, No. 3:06CV3117, 2008 WL 271657, at *2 n.2 (N.D. Ohio Jan. 31, 2008) (holding that a post-deposition affidavit's new assertions, filed after the close of discovery should not be considered in deciding a motion for summary judgment), *aff'd*, 307 F. App'x 917 (6th Cir. 2009).  Reich offered no persuasive justification for this contradiction, so the district court disregarded it.

Even generously viewing this affidavit as noncontradictory, Reich makes no real attempt to argue that she filed her affidavit to supplement or clarify her deposition testimony—in other words, that it should not be viewed as "an attempt to create a sham fact issue."  *Aerel*, 448 F.3d at 908.  All other signs point the same direction; Reich made no attempt to clarify or qualify her answers on this issue at her deposition when questioned by her own attorney, had access to the scene before (and after) her deposition testimony, and did not claim that her earlier testimony reflected confusion about the questions asked.  *See id.* at 908–09 (citing these three factors as "[a] useful starting point for this inquiry").  In fact, her affidavit concedes that she "returned to the scene of the incident with [her attorney] to . . . respond to [defendants'] motion for summary judgment."  R. 61-15, PageID 2565; *see Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003).

As for the dissent, it grounds its disagreement on Reich's not having access to the site *during* her deposition, and on the evidence therefore being "newly discovered."  Not knowing the distances before her deposition, is one thing.  But not using the many months between that deposition date and the end of the discovery period to visit the site, take measurements, and amend her testimony is quite another.  Rather, she waited until after discovery closed and she

could no longer be deposed to offer her revised view. This timing supports evaluating the evidence as "newly discovered" only in the sense that she refused to "discover" it earlier.

We see no abuse of discretion in the district court so deciding.

### B. Excessive Force

Reich argues the officers violated the Fourth Amendment in shooting Blough.[3] The officers assert the affirmative defense of qualified immunity. The district court held that qualified immunity shielded the officers. We agree.

Qualified immunity protects government officials from civil damages "unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This doctrine "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009) (citation omitted). Plaintiffs bear the burden of showing that qualified immunity does not apply, and must show both prongs to carry it. *Id.* Courts have discretion to engage the prongs in any order, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), so we first answer whether the officers violated Blough's constitutional right to be free from excessive force.

We analyze excessive force claims during the "seizure" of a free citizen under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 392 (1989). An officer's use of deadly force is objectively reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017); *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007). This objective test requires courts to judge the use of force from the perspective of a reasonable

---

[3]Reich did not appeal her Eighth Amendment claim. *See generally* Appellant Br. At the summary judgment hearing in October 2018, plaintiffs stated that they no longer wished to pursue the claim, so the district court dismissed it as moot.

officer on the scene, "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 396.

That means we must give careful attention to the facts and the totality of the circumstances of the case, "including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396; *see Garner*, 471 U.S. at 8–9. Police officers routinely face "tense, uncertain, and rapidly evolving" situations that force split-second judgments about the degree of force required; our calculus must account for that fact. *Graham*, 490 U.S. at 396–97. So we evaluate the force used through the eyes of a reasonable officer at the scene, not with "the 20/20 vision of hindsight." *Id.* at 397; *see Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) ("This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force that is necessary" in a particular situation.).

Our precedents further refine our view by requiring that we analyze excessive force claims in segments. *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996); *see Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007). This approach requires us to evaluate the use of force by focusing "on the 'split-second judgment' made immediately before the officer used allegedly excessive force," not on the poor planning or bad tactics that might have "created the circumstances" that led to the use of force. *Lubelan*, 476 F.3d at 407 (quoting *Dickerson*, 101 F.3d at 1161); *see Rucinski v. City of Oakland*, 655 F. App'x 338, 342 (6th Cir. 2015) ("[W]e are required to . . . focus[] on the moments immediately preceding th[e] use of force[.]").

We thus need not engage Reich's argument that the officers created the need to use deadly force by pursuing and initiating contact with Blough despite his mental illness. Even were we to consider that argument, Supreme Court precedent suggests that it should not change our answer. *See City and Cty. of S.F. v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) ("[Plaintiff] cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.") (internal quotation marks omitted).

Nor do we find persuasive Reich's citation to *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004), for the proposition that we should consider a person's mental illness when determining whether an officer used reasonable force. That case actually says that "[t]he diminished capacity of an *unarmed* detainee must be taken into account when assessing the amount of force exerted." *Id.* at 904 (emphasis added). Wielding a knife until the moment officers shot him obviates *Champion* here. And Reich points to "no case law restricting an officer's ability to use deadly force when she has probable cause to believe that a mentally ill person poses an imminent threat of serious physical harm to her person[.]" *Rucinski*, 655 F. App'x at 342.

With that foundation, our analysis focuses on the officers' final encounter with Blough. We construe the evidence and draw all reasonable inferences in Reich's favor but, because this case concerns qualified immunity, consider "only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017). That means we put aside the numerous 911 calls from neighborhood residents describing Blough's alarming behavior and the steps each took to secure their homes and families. *See* R. 61-11, PageID 2329 ("We don't hear the 911 calls. We just hear what we're dispatched to."). Here, applying the *Graham* factors, the totality of the circumstances gave the officers probable cause to believe that Blough posed a threat of serious physical harm to them and others.[4] *See Garner*, 471 U.S. at 11.

The undisputed facts show that both officers saw Blough wielding a knife, shirtless, pacing back and forth between houses in the neighborhood.[5] They both knew that he had severe schizophrenia, had not been taking his medication, disliked the police, and thought "everybody [was] out to get him." After the officers exited their vehicles, Blough walked at a fast pace toward the officers with the knife in his right hand and refused Reich's pleas to drop the knife and return to her vehicle. Both officers stayed near their vehicles, never moving toward Blough.

---

[4]Because this situation plainly fits within the *Graham* test, we, like the district court, look past the "more tailored set of factors" suggested for medical-emergency cases. *See Estate of Hill by Hill v. Miracle*, 853 F.3d 306, 314 (6th Cir. 2017).

[5]As Officer McMillen explained, Blough's conduct constituted—at the very least—trespass, disorderly conduct, menacing, and wanton endangerment.

When both officers then commanded—at least once each—that Blough drop the knife, he again did not.  Instead, Blough "took a step forward toward" Richardson with his knife raised in his right hand in a stabbing position and said, "you're gonna have to kill me mother ****er." That prompted officers to fire three rapid shots in a single volley—the first two by Richardson, the last by McMillen—with Blough having advanced within six to twelve feet of Officer Richardson.  Reich claims that Blough "turned around" and took "one or two steps" before the officers fired, and thus posed no threat to anyone at the time the officers fired.

Absent Blough's step away, our precedents provide a clear answer.  In *Chappell*, we held the use of deadly force objectively reasonable where detectives shot and killed a fifteen-year-old when he stepped toward them, closing the distance to five to seven feet, raised his right hand holding a knife, and refused commands to drop it.  585 F.3d at 910–11.  *See Rhodes v. McDannel*, 945 F.2d 117, 118 (6th Cir. 1991) (holding use of deadly force objectively reasonable where officer shot and killed suspect brandishing a knife after suspect failed to comply with demands to drop the knife and advanced within four to six feet of the officer).  More recently, in *Rucinski*, we held that an officer acted reasonably as a matter of law when she shot and killed a mentally ill man after he pulled out and opened a knife, said "here we go" or "bring it on," moved toward the officer, disregarded orders to drop the knife, and approached to within five feet of the officer while "brandishing the knife in his outstretched hand."  655 F. App'x at 341–42.

But even including Reich's view that Blough "step[ped] away" in the story, the officers' conduct was still objectively reasonable—Blough had just told Officer Richardson "you're going to have to kill me mother ****er," refused repeated commands to drop his weapon, and advanced within six to twelve feet of Richardson with the knife raised in a stabbing position. *Stevens-Rucker v. City of Columbus*, 739 F. App'x 834, 840 (6th Cir. 2018) (holding use of force objectively reasonable where officer shot man holding knife six to eight feet away after he refused to drop the knife, even though it "[was] certainly possibl[e] that [he] was merely attempting to leave the enclosure," because "it [was] undisputed that his first move—once confronted by [the officers]—was a move toward [one officer]").

Yes, in addition to the bullet that grazed Blough's forearm and entered his "lower right chest," one bullet entered Blough's "upper right back." But the officers fired from different spots, and Blough approached Officer Richardson "at a slight angle" with his body "bladed a little bit," not with his shoulders square to the officers. *See Gaddis v. Redford Twp.*, 364 F.3d 763, 776–77 (6th Cir. 2004) (reasoning that, because the officers fired at Gaddis from different vantage points, his back wound from the shots did not undercut the officers' testimony (corroborated by video) that they fired in response to a knife attack). Taken as a whole, this record cannot support the inference Reich wishes us to draw—that the officers shot despite Blough posing no imminent threat at the time. *See Chappell*, 585 F.3d at 909 ("[A]ll *reasonable* inferences are drawn in favor of the plaintiff, to the extent supported by the record[.]") (emphasis added).

Though we view the facts in the light most favorable to Reich, we note that her version of events only faintly resembles the picture offered by the officers, the eyewitnesses, and the medical evidence. What's more, her own deposition testimony often contradicts. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming grant of summary judgment in excessive force case where "nothing in the record" supported plaintiff's allegations "other than plaintiff's own contradictory and incomplete testimony"). At times she painted a protracted confrontation: that the first shot struck Blough's back, prompting him to turn around and say "you shot me," and that he turned around *again* (back facing the group) before the officers resumed firing. But at other times she testified that Blough did not "say anything else to" the officers, and that the officers fired rapidly—"[i]t was bam, bam, bam, like pretty much right there together."

In the face of such contradictions, no reasonable fact finder would credit her allegation that, after being shot once, Blough turned to the officers, spoke, and then turned around before the officers fired the second and third shots. *See Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 449 (6th Cir. 2017) ("Although the non-moving party is entitled to all reasonable inferences when evaluating a summary judgment motion, when a plaintiff's claims are only supported by his 'own contradictory and incomplete testimony . . . no reasonable person would undertake the

suspension of disbelief necessary to credit the allegations made in his complaint." (quoting *Jeffreys*, 426 F.3d at 555)).

"This is not a case where 'a jury could conclude that [the police were not] in any danger[.]'" *Mullins v. Cyranek*, 805 F.3d 760, 767 (6th Cir. 2015) (citation omitted). Still armed and belligerent, Blough posed a serious threat to Officer Richardson and neighborhood residents. In a matter of seconds, Blough advanced within feet of an officer in a residential neighborhood, ignored commands to drop his knife, stepped toward the officer, raised the knife, and told the officer he would have to kill him. Where "all parties agree that the events in question happened very quickly," *Graham*'s prohibition on evaluating the scene with 20/20 hindsight "carries great weight." *Untalan v. City of Lorain*, 430 F.3d 312, 315 (6th Cir. 2005) (citation omitted). The calculus of reasonableness thus permits the officers' split-second determination here. *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) ("We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.").

Even were we to find a constitutional violation, Reich has failed to show that the unlawfulness of the officers' conduct was clearly established at the time. *Wesby*, 138 S. Ct. at 589. To be "clearly established," the law must have been "sufficiently clear" such that "every 'reasonable official would understand that what he is doing' is unlawful." *Id.* (internal quotation marks omitted). In other words, existing case law "must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And it must not be defined at "a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). That's especially true in the Fourth Amendment context, "where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* Thus, in excessive force cases, qualified immunity shields the officers "unless existing precedent 'squarely governs' the specific facts at issue." *Id.* at 1153 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)). Given our decisions in *Chappell* and *Rhodes*, we cannot say that *every* reasonable officer would have understood his actions to be unlawful.

The dissenting opinion argues that it was error to exclude Reich's affidavit and that the affidavit defeats qualified immunity. But the district court held that it would grant summary judgment even if it considered the affidavit. We agree. Shooting Blough from a distance of twenty-five to thirty-six feet would not have violated any clearly established right. Because "officers of reasonable competence" could believe that it did not violate the Constitution, Officers Richardson and McMillen may not be held liable. *Malley v. Briggs*, 475 U.S. 335, 341 (1998).

If Reich's affidavit were credited, Blough would still be a knife-wielding belligerent who (as the officers knew) disliked the police, had "real bad" schizophrenia, and was not taking his medications. He would still have ignored the officers' demands that he drop the knife. He would still have advanced toward them with his knife hand raised in a stabbing position. And he would still have announced—moments before the shooting—"you're gonna have to kill me mother ****er."

The only change the affidavit would make is to place Blough some twenty feet farther away from the officers. An assailant can close that distance in a second or two. There is no rule that officers must wait until a suspect is literally within striking range, risking their own and others' lives, before resorting to deadly force.

Considering how perverse such a rule would be, it is no surprise that no authority—including the dissent's—clearly establishes it. Indeed, *Sova v. City of Mt. Pleasant* does not stand for a "strike zone" rule. 142 F.3d 898 (6th Cir. 1998). *Sova* does not even mention the suspect's distance from the officers. While *Studdard v. Shelby County* does mention distance, it does so as only one factor among several, not as the be-all and end-all of Fourth Amendment reasonableness. *See* 934 F.3d 478, 481–82 (6th Cir. 2019). Reading *Sova* and *Studdard* would not impress upon every reasonable officer the clear understanding that it is illegal to shoot someone behaving like Blough if that person is twenty-five feet away from one officer and thirty-six feet away from another.

In the "tense, uncertain, and rapidly evolving" circumstances of Blough's encounter with Officers Richardson and McMillen, reasonable minds could deny that twenty feet made the

difference between a legal use of deadly force and an illegal one. *Graham*, 490 U.S. at 396–97. Thus, for the same reasons the officers did not violate constitutional law by shooting Blough if he was five feet away, they did not violate *clear* constitutional law by shooting Blough if he was twenty-five to thirty-six feet away. No legal principle "clearly prohibit[ed]" the use of deadly force "in the particular circumstances before [the officers]." *Wesby*, 138 S. Ct. at 590. And it was not "plainly incompetent" for the officers to consider Blough a threat. *Id.* at 589 (citation omitted).

## C.  State Law Claims

Reich argues that Officers Richardson and McMillen violated various state laws during the confrontation with Blough. The officers again raise the defense of qualified immunity, this time under Kentucky law. The district court agreed with the officers. So do we.

Under Kentucky law, qualified immunity protects a police officer so long as he performed "(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of [his] authority." *Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001). This doctrine applies to negligence actions and intentional torts. *Gati v. W. Ky. Univ.*, 762 F. App'x 246, 253 (6th Cir. 2019). The determination of the amount of force required, including the decision to use deadly force, is a discretionary act. *Nichols v. Bourbon Cty. Sheriff's Dep't*, 26 F. Supp. 3d 634, 642 (E.D. Ky. 2014); *see Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014) (stating that discretionary acts involve "the exercise of discretion and judgment, or personal deliberation, decision, and judgment"); *Yanero*, 65 S.W.3d at 522 (noting that qualified immunity affords protection for "good faith judgment calls made in a legally uncertain environment").

And the use of deadly force plainly falls within the scope of a police officer's authority. Ky. Rev. Stat. Ann. § 503.050(1)-(2) (stating that an officer may use deadly force if he "believes that such force is necessary to protect himself against death[] [or] serious physical injury"); *see Woosley v. City of Paris*, 591 F. Supp. 2d 913, 922 (E.D. Ky. 2008). Because the officers performed discretionary acts within their authority, the burden shifts to Reich "to establish by direct or circumstantial evidence that the discretionary act[s] w[ere] not performed in good faith." *Yanero*, 65 S.W.3d at 523.

That leaves us with the question whether the officers acted in good faith. This inquiry, adopted from the Supreme Court's decision in *Harlow*, has both an objective and subjective component. *Id.* (citing *Harlow*, 457 U.S. at 815). Objectively, a court must ask whether the officer's conduct demonstrates "a presumptive knowledge of and respect for basic, unquestioned constitutional rights." *Bryant v. Pulaski Cty. Detention Ctr.*, 330 S.W.3d 461, 466 (Ky. 2011). Subjectively, courts ask whether the official behaved with "permissible intentions." *Id.* Thus, Reich can show bad faith by pointing to (1) "a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded a person in [Blough's] position"; or (2) evidence that an officer "willfully or maliciously intended to harm [Blough] or acted with a corrupt motive." *Id.*; *Yanero*, 65 S.W.3d at 523.

Our analysis of Reich's Fourth Amendment claim takes care of prong one—the officers did not violate Blough's constitutional right to be free from excessive force and, even if they did, the unlawfulness of the officers' conduct was not clearly established at the time. As to the second, Reich never argued that the officers willfully or maliciously intended to harm Blough or acted with corrupt intentions. *See Howell v. Sanders*, 668 F.3d 344, 356 (6th Cir. 2012) ("This inquiry is resolved by determining 'whether the official has behaved with permissible intentions.'") (citation omitted). To be sure, Reich's opening brief includes one line addressing the issue: "[T]he patently unjustifiable circumstances of [the] shooting . . . raise the question of whether [the officers] acted with malice or a corrupt motive, which is a state-of-mind issue that must be resolved by a jury[.]" Appellant Br. 53. This statement, however, unsupported by citation to the record, fails to present a genuine issue of fact. *See Matsushita*, 475 U.S. at 586. Our independent review of the record turned up no facts to support a finding of bad faith.

For that reason, Reich's claims of negligence, negligent infliction of emotional distress, and wrongful death fail. *See Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016) ("[A] wrongful death claim . . . is, at its core, a tort claim based upon negligence."); Ky. Rev. Stat. Ann. § 411.130(1). So too her common law battery claim. *See Atwell v. Hart Cty.*, 122 F. App'x 215, 219 (6th Cir. 2005) (holding that a battery claim under Kentucky law must fail where the officer's conduct was deemed objectively reasonable in the § 1983 context). Same goes for her

outrage and intentional infliction of emotional distress claims. *See id.* ("[T]he torts of outrage and intentional infliction of emotional distress are premised upon extreme and outrageous conduct intentionally or recklessly causing emotional distress.").

Last, Reich's briefs lodge no argument supporting claims, federal or state, against the City of Elizabethtown. But even if she had mentioned here the same claims she brought below—negligent hiring, training, and supervising—they would fail because she has not shown that the officers inflicted a constitutional harm on Blough. *See Scott v. Clay Cty.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[O]ur conclusion that no officer-defendant had deprived the plaintiff of any constitutional right a fortiori defeats the claim against the County as well."); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 471 (6th Cir. 2006); *Whitlow v. City of Louisville*, 39 F. App'x 297, 302 (6th Cir. 2002) ("[I]f Whitlow suffered no constitutional violation, then Plaintiff's claims against Louisville . . . alleging that their lack of training and failure to supervise the individual officers resulted in Decedent's death, must fail.").

We AFFIRM.

—————————

**DISSENT**

—————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  The majority paints a distressing picture, one in which Officers Richardson and McMillen shot and killed Joshua Blough because he was a "knife-wielding belligerent" "advanc[ing] toward them with his knife hand raised in a stabbing position," and screaming obscenities like "you're gonna have to kill me mother ****er." Maj. Op. at 15.  If the record supported that picture—and that picture alone—I might agree with my colleagues that the officers are entitled to qualified immunity.  The problem, however, is that the record is not amenable to such a one-sided rendering.  Rather, as I see it, there are two sides to this story:  the officers' view—which the majority details with great care— and Elizabeth Reich's view—which the majority sweeps under the rug.  And, as Reich tells it, Officers Richardson and McMillen shot and killed her fiancée, Blough, right in front of her, (a) while Blough was standing *20 to 30 feet away* from the officers and Reich, and (b) while Blough was *turning to run away from the officers*.  Accepting Reich's narrative as true, as we must at this stage of litigation, any reasonable police officer should have known that shooting Blough violated clearly established Sixth Circuit law.  *See Studdard v. Shelby County*, 934 F.3d 478 (6th Cir. 2019); *Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998).  Accordingly, in my view, qualified immunity does not protect Officers Richardson and McMillen; this case should be going to trial.

**A.  Reich's Affidavit**

As an initial matter, I, unlike the majority, believe the district court abused its discretion when it disregarded Reich's post-deposition affidavit.  Consequently, in my opinion, Reich's affidavit should be considered as important a piece of evidence as anything else in the record. This is so for the following reasons.

At her deposition, Reich testified that, during the final confrontation between Blough and the officers, the officers ordered Blough to put down his knife.  After that, Reich continued, Blough "took a step forward toward them and then he turned around to run," prior to being shot.

R. 55-5 (Reich Dep. at 102–03) (Page ID #614–15).  Defense counsel then asked Reich about Blough's distance from the officers.  The following colloquy occurred:

Q:      Okay, when he took a step toward the officers, how close was he to the officers?

A:      He was far enough away that it—they—he wasn't a direct threat to them.

Q:      Okay.  Can you estimate that in feet or yards or car lengths—

A:      No.

Q:      —or—

A:      No, because I'm not sure.

Q:      Okay.  And I don't want you to guess,—

A:      Right.

Q:      —I'm just—

A:      Yeah, I'm not—I don't want to guess about it.

Q:      Or, you know, you can look at this room and the clock down there or something.  I—I'm just trying to get an idea was—was Josh ten feet away, 20 feet away, 30 feet away, 50 feet away.

A:      I would say about 20.

Q:      Okay.  And was—was he 20 feet when he took a step toward them or was that the 20 feet or—

A:      Yeah, it was probably 20 feet being when he took a step toward them.

Q:      Okay.  So he's roughly 20 feet away, plus he took one step toward them, which would bring him roughly what, I don't know, 18, 17—

A:      Yeah.

Q:      —something like that.  And then he turned and went the—

A:      He turned to—

Q:      —other direction.

A:      Yeah, he turned around to run.

R. 55-5 (Reich Dep. at 103–04) (Page ID #614).  Some intervening testimony occurred, and then counsel returned to the subject of distance:

Q:      I don't want you to guess, I'm just trying to get an idea, would he have then been 22 or 23 feet or so away when he was shot?

Reich's counsel then intervened:

> [Reich's counsel]:  You know, I've let it go on way too long I guess.  You say you don't want her to guess, but then you want her to guess.  So I'm going to object to the question.  You can—if you feel comfortable with the distances and so on, you can testify to that—
>
> [Reich]:  Right.
>
> [Reich's counsel]:  —but don't guess.
>
> [Reich]:  Okay.

Reich and defense counsel resumed their conversation:

> A:    Yeah, I don't feel comfortable with the—the estimated length of—you know, I don't feel comfortable with it.  Because it's been a long time and I just don't feel comfortable with estimating on that.
>
> Q:    So your testimony is that you have no idea how far Josh was from the officers when he was shot.
>
> A:    Right.  But he was far enough that he wasn't a threat to them.
>
> Q:    Okay.  But you have no idea how far he was when he was shot.
>
> A:    No.

*Id.* at 105–06 (Page ID #615).

About a year later, Reich (and her attorney) returned to the site of the shooting—a spot Reich had long avoided due to the emotional trauma it provoked—and decided to place cones at the spots where Reich believed she, Blough, Richardson, and McMillen had stood at the time of the shooting.  R. 63-3 (Reich Aff. at 1, 3) (Page ID #2965, 2967).  Reich then reported the results of this exercise in an affidavit in response to Defendants' summary-judgment motion.  More specifically, Reich placed Blough as having been 25 feet and 6 inches from Richardson, 36 feet and 4 inches from McMillen, and 34 feet and 6 inches from herself at the moment he was shot. *Id.* at 3 (Page ID #2967).  Notably, despite the considerable differences between Reich's affidavit's measurements and the distance estimates that McMillen and Richardson offered at their depositions, the locations of the cones placed by Reich more or less line up with the scene described by the officers:  Blough had been shot at the edge of the grass and the street, the officers had been in the middle of the street (because they had parked in the right lane and were standing beside the drivers' sides of their vehicles), Blough and Reich were closer to Richardson

than to McMillen, and McMillen was farther down the street than Richardson. R. 63-3 (Reich Aff. at 46) (Page ID #3010).

"A party cannot create a factual dispute by filing an affidavit, after a motion for summary judgment has been made, which contradicts earlier testimony." *Dotson v. U.S. Postal Serv.*, 977 F.2d 976, 978 (6th Cir. 1992). If the party does so, she "must explain why she disagrees with herself." *Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 352 (6th Cir. 2013). Where "the alleged inconsistency created by the affidavit existed within the deposition itself," however, the later affidavit should be allowed. *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 593 (6th Cir. 2009) (quotation omitted). In such a case, "there is no direct contradiction" and "the court must not disregard the affidavit, unless the court determines that the affidavit constitutes an attempt to create a sham fact issue." *Id.* (quotation omitted). "Factors relevant to the existence of a sham fact issue include [1] whether the affiant was cross-examined during his earlier testimony, [2] whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and [3] whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *accord Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006).

We have applied these standards to allow the striking of affidavits that are truly in *direct* conflict with the *unequivocal* content of the earlier testimony. In *Powell-Pickett v. A.K. Steel Corp.*, for example, the plaintiff invoked a constant refrain of "I don't recall at this time" in response to broad deposition questions about the discrimination she allegedly suffered. 549 F. App'x at 351–52. In opposing a motion for summary judgment, however, the plaintiff submitted an affidavit that recounted specific instances of discrimination. *Id.* at 352. We accordingly concluded that, because the plaintiff had "profess[ed] a comprehensive and incredible lack of memory" at her deposition, and yet had submitted no evidence explaining why she had been so unresponsive, the district court acted properly when it struck her affidavit. *Id.* at 353. By contrast, in *Briggs v. Potter*, 463 F.3d 507, 513–14 (6th Cir. 2006), we concluded that the district court abused its discretion when it struck an affidavit that merely added "greater detail" to a subject a party had been questioned about only in generalities at his deposition.

Reich's affidavit submitted in opposition to Defendants' motion for summary judgment neither directly contradicts her deposition testimony nor fails to explain any inconsistencies between them. Rather, it is easy to understand why she could not answer questions about the distance between the actors present at the scene of the shooting during her deposition and why she was able to furnish that information in the subsequent affidavit.

To begin, this is a case where "the alleged inconsistency created by the affidavit existed within the deposition itself," not one where the later affidavit directly contradicted unequivocal testimony from the earlier deposition. *O'Brien*, 575 F.3d at 593 (quoting *Kennett-Murray Corp.*, 622 F.2d at 894). Unlike the plaintiff in *Powell-Pickett*, Reich neither testified unequivocally about, nor completely denied knowledge of, the general distance between the parties present at the shooting. The fairest interpretation of the quoted exchange from Reich's deposition is *not* that she had no knowledge *at all* of the distances between the various actors during the shooting she witnessed, but rather that she did not feel comfortable estimating those distances in feet and inches while sitting at her deposition. Indeed, Reich initially ventured a guess when pressed (20 feet between Richardson and Blough, which is fairly close to the 25 feet and six inches measurement included in her affidavit) before then admitting she was unsure of "the estimated length." R. 55-5 (Reich Dep. at 105–06) (Page ID #615). In other words, Reich did anything but provide a "definitive answer" to the distance issue at her deposition. Maj. Op. at 7.

Furthermore, Reich did not create a sham issue of fact with her affidavit. Consider the three *Franks* factors. First, although Reich was essentially cross-examined at her deposition, the questioning by both attorneys only teased out the equivocal nature of her testimony. *See O'Brien*, 575 F.3d at 593 ("[Whether the deponent/affiant was cross-examined] matters, because a party who is cross-examined but nevertheless offers *unequivocal* testimony, only to be contradicted by a later affidavit, has indeed tried to create a sham fact issue.") (emphasis added). Second, Reich did not have "access to the pertinent evidence at the time of" her deposition. *Franks*, 796 F.2d at 1237. She had not been back to the site of the shooting since it occurred years earlier and had certainly not been there with a tape measure. Consequently, her affidavit is best classified as "newly discovered evidence." *Id.* And, third, as I explained above, Reich's "earlier testimony reflects confusion which [her later] affidavit attempts to explain." *Id.*

Moreover, unlike the party offering the stricken affidavit in *Powell-Pickett*, Reich explained any inconsistency between her deposition testimony and her affidavit:  she had initially avoided returning to the site of the shooting because it was emotionally traumatic to do so, but then summoned up the courage when it became necessary to clarify her earlier testimony.

All told, although a reasonable juror might find the timing of Reich's affidavit concerning, that does not mean the district court had a firm legal basis on which to strike the affidavit in its entirety.  Accordingly, the district court abused its discretion when it struck Reich's affidavit; I would consider it part of the record in evaluating Defendants' motion for summary judgment.  *See Briggs*, 463 F.3d at 511 (noting that a district court can abuse its discretion by "misapply[ing] the correct legal standard when reaching a conclusion").

**B.  The Facts, Viewed in the Light Most Favorable to Reich**

With that threshold issue resolved, I now consider what version of the facts we must accept as true for purposes of this appeal.  With respect to the legal standard, I agree with the majority:  "Courts must construe the evidence and draw all reasonable inferences in favor of the nonmoving party," here, Reich.  Maj. Op. at 5–6 (quotation omitted); *accord Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("[U]nder either prong [of the qualified-immunity analysis], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.").  When it comes to applying this standard, however, the majority ignores or downplays two genuine disputes of material fact, both of which are essential to the resolution of this case:  First, Blough's *distance* from Reich, McMillen, and Richardson at the time the officers shot him.  Second, Blough's *position* vis a vis the officers and Reich at the time the officers shot him.

Viewing these disputes in the light most favorable to Reich, a reasonable juror could find (1) that Blough was dozens of feet from any other person at the time he was shot, and (2) that he was turning to run away from the officers at that time, too.  Accordingly, I, unlike the majority, would credit those two facts as true, period.  *But see* Maj. Op. at 13–14 (repeatedly casting doubt on Reich's credibility, instead of simply accepting her narrative as true).

**1. Distance between Blough, Reich, and the officers at the time of the shooting**

With respect to the distances between Blough, Reich, and the officers at the time of the shooting, Officer Richardson testified that when he first began speaking to Blough, Blough was across the street from Richardson, standing between two houses, some 125 feet away. Richardson then testified that Blough advanced from the grassy yard to the edge of the road and was only "six to eight feet" away from him when he (Richardson) opened fire. R.55-9 (Richardson Dep. at 92) (Page ID #709); *accord* R. 55-10 (McMillen Dep. at 152) (Page ID #775) (similar testimony).

Reich, however, disagrees. Again, as Reich tells it, at the moment the officers shot Blough, Blough was 25 feet and 6 inches away from Richardson, and 36 feet and 4 inches away from McMillen. R. 63-3 (Reich Aff. at 3) (Page ID #2967). Reich's testimony thus puts Blough three to four times further away from Richardson than Richardson's and McMillen's accounts do.

**2. Whether Blough had turned to run**

With respect to whether Blough had turned to run by the time the officers shot him, Officer McMillen testified that Blough never stopped to turn away and was facing Richardson during the entire encounter. R. 55-10 (McMillen Dep. at 154) (Page ID #776).

Reich, however, testified that Blough *had* turned to run away from the officers and had taken "one or two steps" away from them before he was shot. R. 55-5 (Reich Dep. at 105) (Page ID #615). She also testified that after Blough was "shot the first time he turned around and said, you shot me," and that, after that, Blough "turned back around and [] got shot two more times." *Id.* at 114 (Page ID #617). And, if that testimony weren't enough, Reich has also pointed out that Blough's autopsy indisputably proved that one of the officers' bullets hit Blough in the "upper right back." R.55-5 (Medical Report) (Page ID #547–48).

The majority attempts to explain away Reich's narrative by either (a) calling Reich's testimony "contradictory," or (b) asserting that the officers must have shot Blough "from different spots" (presumably reasoning that one officer shot Blough in the chest while the other

shot him in the back). Maj. Op. at 13–14. This reasoning not only ignores the testimony of Defendants' own ballistics expert—who opined that the two bullets that struck Blough came from *just* Officer Richardson's gun (thus obviating the majority's "second shooter" theory), *see* R. 55-20 (Smock Rep. at 9) (Page ID #915)—but it impermissibly prejudges Reich's credibility, which, of course, we cannot do at this stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, *not* those of a judge.") (emphasis added). Police officers may be entitled to a number of unique defenses in civil litigation, but a watered-down summary-judgment standard is not one of them. *Tolan*, 572 U.S. at 656–57.

**C. Qualified Immunity**

With this understanding of the facts in hand, I now turn to qualified immunity. Again, I agree with the majority's description of the legal standard in all relevant respects. Qualified immunity is a two-pronged inquiry, where we ask (1) whether the officers "violated a federal statutory or constitutional right," and (2) whether "the unlawfulness of [the officers'] conduct was clearly established at the time." Maj. Op. at 9 (quotation omitted). We must "evaluate the force used through the eyes of a reasonable officer at the scene, not with the 20/20 vision of hindsight." *Id*. at 10 (quotation omitted). And clearly established law "must not be defined at a high level of generality." *Id*. at 14 (quotation omitted). Rather, "existing precedent" must "squarely govern[] the specific facts at issue." *Id*. (quotation omitted).

But, even accepting all these premises as true,[1] I still believe that Defendants are not entitled to qualified immunity here, on these specific facts.

With respect to prong one, a reasonable juror could find that Defendants used excessive force against Blough, in violation of the Fourth Amendment. *See* Maj. Op. at 9–10 (setting forth standard). Two cases—one very recent, the other a bit older—prove the point.

---

[1]It bears mentioning that, in recent years, jurists and scholars from across the ideological spectrum have questioned whether we *should* accept all of these premises as true. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1161–62 (2018) (Sotomayor, J., dissenting); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871-72 (2017) (Thomas, J., concurring); *Zadeh v. Robinson*, 902 F.3d 483, 498-500 (5th Cir. 2018) (Willett, J., concurring); William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018).

First, in *Sova v. City of Mt. Pleasant*, 142 F.3d 898 (6th Cir. 1998), we considered whether the police violated the Fourth Amendment when they shot and killed a suicidal, knife-wielding man standing in his front door—near his parents—and yelling to the police "that he wanted [them] to shoot him." *Id.* at 901. Although the police claimed the man "charged at them through the kitchen door with knives drawn on the porch," and that they accordingly had no choice but to shoot to kill, we denied qualified immunity at summary judgment because the man's parents claimed the officers shot their son "before he ever stepped out of the kitchen doorframe" (meaning the officers weren't necessarily in immediate physical danger at the moment they fired their weapons). *Id.* at 902–903.

Similarly, in *Studdard v. Shelby County*, 934 F.3d 478 (6th Cir. 2019), *petition for cert. filed*, No. 19-609 (Nov. 12, 2019), we considered whether the police violated the Fourth Amendment when they shot and killed a suicidal, knife-wielding man standing beside a road, about 34 feet from the officers, swaying and threatening to slit his own throat. *Id.* at 480. We likewise denied the officers qualified immunity at summary judgment, reasoning that, although the man was "dangerous and uncooperative," and had "refused to comply with [the officers'] commands to put the knife down," the man "did not pose a serious risk to anyone in the area" at the moment he was shot because he was 30-some feet away from the officers and had not moved towards the officers in any appreciable way. *Id.* at 481. "There is a world of difference between a knife-wielding suspect who runs at officers and one who doesn't," we observed. *Id.* at 483.

This precedent effectively resolves the prong-one analysis. Even acknowledging the "tense, uncertain, and rapidly evolving" nature of Defendants' encounter with Blough, and the challenges of evaluating police conduct with "the 20/20 vision of hindsight," Maj. Op. at 10, if there was a genuine dispute of material fact in *Sova* and *Studdard* as to whether the suicidal, knife-wielding decedent posed a "threat of serious physical harm" to the surrounding public, such that deadly force was justified, surely there is a triable dispute here. If anything, Reich's testimony that Defendants essentially shot Blough in the back, as he turned to run away, makes the officers' actions even *more* unreasonable than the actions at issue in *Sova* and *Studdard*. *Cf. Bouggess v. Mattingly*, 482 F.3d 886, 892 (6th Cir. 2007) (finding fact issue as to whether officer

behaved reasonably when evidence showed that officer shot the plaintiff "three times in the back," following a "hand-to-hand struggle").

This brings me to the second prong of the qualified-immunity analysis—clearly established law. As the majority observes, this is a tough standard, meant to protect "all but the plainly incompetent or those who knowingly violate the law." Maj. Op. at 9 (quotation omitted). But it is not insurmountable. *See, e.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (noting that there does not need to be a case "directly on point" for a right to be clearly established); *Hagans v. Franklin County Sheriff's Office*, 695 F.3d 505, 508–09 (6th Cir. 2012) (similarly remarking that a constitutional right need only be "*reasonably* particularized" by prior case law). In my view, then, the correct question to ask for purposes of this second prong is whether, as of July 6, 2015, our law clearly established that it was unconstitutional for a police officer to shoot a non-compliant, mentally unstable person with a knife, *if* that person was *not* advancing toward another individual in the immediate area.

The answer to the question is yes. In 1998—almost two decades before the shooting— *Sova* established that reasonable police officers do *not* shoot non-compliant persons brandishing knifes when they are *not* advancing toward another individual in the immediate area, even if the person is mentally ill, suicidal, and/or yelling threats to the officers.**2** Consequently, because a reasonable juror could find that Defendants violated this clearly established law when they shot Blough, Reich has met her burden under prong two.

In response, the majority claims I am trying to create a black-and-white "strike zone rule," where the viability of a Fourth Amendment claim rise and falls solely on the precise number of feet the decedent stood from the police at the time of the shooting. Maj. Op. at 15. I am not. I am simply noting that, when confronted with a materially similar set of facts twenty years ago, we held that qualified immunity did not lie, and that, therefore, Officers Richardson and McMillen were on fair notice that qualified immunity would not protect them here either. *Cf. Kisela*, 138 S. Ct. at 1154 (finding that officers were *not* on "fair notice" that their conduct violated the Fourth Amendment because the factual differences between the purportedly

---

**2**Indeed, just four months ago, another panel of this court found exactly that. *See Studdard*, 934 F.3d at 481–83 (relying on *Sova* as "clearly established law").

governing Ninth Circuit precedent and the facts before the Court "leap[t] from the page"). Indeed, to hold otherwise is to hold Reich, and other Fourth Amendment plaintiffs like her, to an impossibly high standard, where they must dredge up a mirror-image case (that happened to arise in this circuit, and happened to result in a decision by this court) to have any hopes of surviving a qualified-immunity challenge at summary judgment. But, because history rhymes far more often than it repeats exactly, we cannot, and should not, condition a Fourth Amendment plaintiff's access to a jury trial on their meeting such an onerous burden.

The majority seeing it differently, I respectfully dissent.