RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0039p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ASHLY ROMERO, as Personal Representative for the Estate of Stephen Romero, deceased,

*Plaintiff-Appellant*,

*v.*

No. 24-1865

CITY OF LANSING, MICHIGAN, a Michigan Municipal Corporation; DONOVAN MOORE and JEFF KURTZ, Officers, individually,

*Defendants-Appellees*.

---

On Petition for Rehearing En Banc
United States District Court for the Western District of Michigan at Grand Rapids.
No. 1:23-cv-01322—Hala Y. Jarbou, District Judge.

Decided and Filed: February 12, 2026

Before: MOORE, GRIFFIN, and RITZ, Circuit Judges.

---

## COUNSEL

**ON PETITION FOR REHEARING EN BANC:** Michael T. Berger, ROSATI SCHULTZ JOPPICH & AMTSBUECHLER PC, Farmington Hills, Michigan, for Appellees. ON RESPONSE: Robert G. Kamenec, FIEGER, FIEGER, KENNEY & HARRINGTON, P.C., Southfield, Michigan, for Appellant.

The court delivered an order denying the petition for rehearing en banc. RITZ, J. (pp. 3–6), delivered a separate opinion, in which MOORE, J., joined, concurring in the denial of the petition for rehearing en banc. GRIFFIN, J. (pp. 7–9), delivered a separate opinion in which BUSH, J., joined, dissenting from the denial of the petition for rehearing en banc. THAPAR and HERMANDORFER, JJ. (pp. 10–19), delivered a separate opinion, in which GRIFFIN, BUSH, LARSEN, NALBANDIAN, READLER, and MURPHY, JJ., joined, dissenting from the denial of the petition for rehearing en banc. BUSH, J. (pp. 20–25), delivered a separate opinion dissenting from the denial of the petition for rehearing en banc. READLER, J. (pp. 26–33), delivered a separate opinion, in which GRIFFIN, BUSH, and LARSEN, JJ., joined, dissenting from the denial of the petition for rehearing en banc.

———————————

**ORDER**

———————————

The court received a petition for rehearing en banc.  The original panel has reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision.  Judge Griffin would grant the petition for rehearing en banc for the reasons stated in his dissent to the court's opinion of November 18, 2025 and for those stated in his dissent appended to this order.

The petition was then circulated to the full court.  Less than a majority of the judges voted in favor of rehearing en banc.

Therefore, the petition is denied.

———————————

**CONCURRENCE**

———————————

RITZ, Circuit Judge, concurring in the denial of rehearing en banc. The full court correctly denies en banc rehearing in this case. In support of rehearing, the defendants argued that the panel opinion conflicted with two cases: the Supreme Court's decision in *Barnes v. Felix*, 605 U.S. 73 (2025), and our decision in *Eastep v. City of Nashville*, 156 F.4th 819 (6th Cir. 2025). Pet. for En Banc Reh'g, at 10-11, 14. The defendants are wrong on both counts.

*Barnes* made clear that "[t]o assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment." 605 U.S. at 76. Here, the panel properly applied *Barnes* by examining not only the moment of Stephen Romero's killing but also the totality of the circumstances, including what the officers saw and heard throughout the entire encounter. For example, the panel opinion accounted for what the officers knew based on the information from dispatch; what the officers saw when they arrived on the scene; and what the officers observed when Stephen reached for his weapon the first time, causing them to shoot him. *Romero v. City of Lansing*, 159 F.4th 1002, 1006-07, 1010-13 (6th Cir. 2025). And the panel did not use an artificially segmented perspective when examining the circumstances surrounding the officers' second round of shots. It was in significant part *because of* what came before that fatal volley of shots—in particular, that the officers had already wounded and brought Stephen to the ground with their first round of shots— that led the panel to hold that Ashly Romero's excessive-force claim could proceed to discovery.

*Eastep* is likewise fully consistent with the panel opinion. *Eastep* involved a police shooting resulting in the death of a suspect who: "(1) consistently and repeatedly disobeyed [officers'] commands to drop his weapon; (2) took two steps towards [officers]; (3) quickly removed an object from his jacket pocket; and (4) using both hands, from a shoulder-level position, pointed the object at officers." 156 F.4th at 829. The suspect had also attempted "to actively resist or evade arrest." *Id.* at 830. Given these facts, we held that an excessive-force suit against most of the defendant officers should be dismissed. *Id.* But those facts are absent here—Stephen never actively resisted officers, never advanced towards them, and never pointed his gun at them. In fact,

in *Eastep* we allowed the excessive-force suit to go forward against one officer who, a mere three seconds after the suspect had been incapacitated and brought to the ground by the first round of shots, fired another round of shots at the suspect. *Id.* at 830-31. The second shooting in this case is akin to the latter set of facts from *Eastep*—where the suspect, having been incapacitated, no longer posed a threat. If *Eastep* conflicted with the panel majority opinion, presumably the panel dissent would have pointed that out. But the dissent did not even cite *Eastep*.

Now, my dissenting colleagues air various grievances with the panel opinion and this area of the law generally. They mischaracterize the facts of this case, failing to take them in the light most favorable to Ashly. And they seek to augment the defendants' rehearing petition with arguments the defendants did not make and cases they did not cite. The points made in these dissenting statements, though, do not represent governing law. The panel opinion does, and it binds district courts and future panels. I will not reproduce the panel opinion's analysis here.

But there is one allegation, first put forward by the panel dissent and amplified again here, that warrants a brief response. That is the idea that the decision in this case "gravely endangers our officers" by creating an "irresponsible and dangerous" risk of harm or potential financial liability that no rational person would voluntarily assume. *See infra* at 9 (Griffin, J., dissenting from the denial of rehearing en banc); *see Romero*, 159 F.4th at 1015 (Griffin, J., dissenting).

This allegation is false. Consider first the disconnect between this hyperbolic accusation and the narrowness of the panel's holding. The panel held only that Ashly's excessive-force claim can proceed to discovery, and we affirmed the dismissal of her other claims. The officers here may well defeat her remaining claim down the road. But at this stage, on the facts as alleged, and under our case law, we cannot dismiss Ashly's excessive-force claim as implausible. It also bears noting that the panel did not decide whether Ashly did enough to allege excessive force during the initial stages of the encounter. *See Romero*, 159 F.4th at 1010. So, the opinion does not preclude a finding in this case, or in cases with similar facts, that the officers were justified in approaching the scene with weapons drawn, or in firing when the armed individual first reached for his gun.

Next, note that the supposed danger posed by the narrow holding in this case has changed since the panel opinion was issued. When the panel issued its opinion, the dissent's allegation was

that the decision "endangers the lives of *all* law enforcement officers in the Sixth Circuit."  *Id.* at 1015 (Griffin, J., dissenting) (emphasis added).  Now the alleged danger extends only to "local and state police officers in our Circuit."  *See infra* at 9 (Griffin, J., dissenting from the denial of rehearing en banc).  This is apparently an effort to wall off federal law enforcement officers from the possibility of damages liability, even when they use deadly force unreasonably as the officers allegedly did here.  *Cf. Egbert v. Boule*, 596 U.S. 482, 486, 495-96 (2022).  In any event, the shifting rationale for the alleged danger posed by the panel opinion further demonstrates the allegation's shaky foundations.

Finally, set aside that it is substantively incorrect to suggest that the holding in this case prevents police officers from using self-defense when appropriate.  Set aside, also, the question of who pays when police officers are found liable for damages.  *See Brown v. City of New York*, 798 F.3d 94, 103 n.15 (2d Cir. 2015) (noting the likelihood of indemnification); *see also Nieves v. Bartlett*, 587 U.S. 391, 426 & n.2 (2019) (Sotomayor, J., dissenting).  Consider instead, more broadly, what underpins the allegation that allowing discovery on this particular claim, on these particular facts, puts police officers in the "impossible situation" of assuming "a high level of personal risk" or "substantial personal financial liability" if they use deadly force.  *See infra* at 9 (Griffin, J., dissenting from the denial of rehearing en banc).  Think about what that allegation assumes about the motives or fortitude of those who choose law enforcement as a career.

Obviously, law enforcement officers have difficult, dangerous jobs.  Nobody who becomes one is blind to that.  And changes in the legal landscape governing how, when, and where civilians can carry firearms have made officers' jobs even more difficult and dangerous.  In many places, for instance, it is perfectly legal for civilians to carry or display a gun, like Stephen was doing when officers shot and killed him.  For good reason, our use-of-force law gives officers the latitude to make quick decisions to protect themselves and others in rapidly developing situations, including when they encounter armed civilians.  This is shown by the legion of cases, many cited by my dissenting colleagues, granting qualified immunity to officers who have used deadly force.

But our use-of-force jurisprudence is not as monolithic as my dissenting colleagues suggest.  Sometimes officers who use deadly force are not entitled to qualified immunity.  As the panel opinion explains, our cases provide space for peaceful resolution of encounters between law

enforcement and civilians (armed or not).  One way is by recognizing that a rapidly developing situation, as circumstances change, can become *less* dangerous to officers.  *See, e.g.*, *Eastep*, 156 F.4th at 830-31; *Lee v. Russ*, 33 F.4th 860, 862-64 (6th Cir. 2022).  Another way is by ensuring that officers allow a civilian who is not posing an imminent threat to comply with commands before they shoot that civilian.  *See, e.g.*, *Bletz v. Gribble*, 641 F.3d 743, 752-53 (6th Cir. 2011).  After all, officers are not the only ones involved in police-civilian encounters.  When officers use deadly force, a civilian dies.  Sometimes that result is justified under the law, due to the actions taken by that civilian.  Sometimes, though, a police-civilian encounter leaves dead a member of the community who should not be dead.  The stakes are high.

Well-trained officers (and their families) know and appreciate all of this, much more tangibly than we do.  They are keenly aware that when faced with an immediate threat they can reasonably use deadly force to defend themselves and others.  Our court's decision in this case does not change that.  They also know that safe and effective policing requires trust from the community, and when an officer uses deadly force unreasonably, it breaks down that trust.  These officers, knowing all of this, go to work each day to serve and protect the public, not to kill people who should not be killed.  The leaders of professional law enforcement agencies know the stakes too, so they conduct training to help their officers manage difficult, dangerous situations.  These agencies and officers further know that, as with most jobs, there can be consequences, financial and otherwise, if they fail to meet certain standards.  (Federal judges can barely relate.)

They do not need us to tell them any of this.  Nor do they need us to offer caricatures about what "our officers," *see infra* at 9 (Griffin, J., dissenting from the denial of rehearing en banc), think about this or any other decision of our court.

That is because officers who want to protect their communities, despite all the potential hazards and consequences, nonetheless make the weighty and courageous decision to take on their perilous responsibilities.  They do so not to get rich, but out of a deep and enduring commitment to public service.  We should celebrate that commitment.  We should not characterize an officer's decision to serve as a cold calculus about financial benefit.  And we should not insinuate that officers are too fragile to accept that their jobs come with risk or they need to act reasonably when using deadly force.

_____

**DISSENT**

_____

GRIFFIN, Circuit Judge, dissenting from the denial of rehearing en banc.

Once again, "the en banc Sixth Circuit [is] unwilling (or unable) to reconcile its precedents." *CNH Indus. N.V. v. Reese*, 583 U.S. 133, 138 n.2 (2018) (per curiam).

Our abdication of responsibility to employ our en banc rehearing procedure has roused the ire of the Supreme Court. As Justice Thomas, joined by Justice Alito, has implored, "The Sixth Circuit can and must do more to correct its own errors." *Davis v. Smith*, 145 S. Ct. 93, 97 (2025) (Thomas, J., dissenting from denial of certiorari). Moreover, "reluctance in deploying en banc review is understandable, but only to a point." *Id.* (citation modified). We "are well past that point." *Id.*

Time and again, Justice Thomas has chastised us (particularly in the AEDPA context) for not correcting our errors of exceptional importance:

> The decision below is the latest in a long line of Sixth Circuit AEDPA errors. This Court has reversed the Sixth Circuit at least two dozen times for misapplying AEDPA. *See Shoop v. Twyford*, 596 U.S. 811 (2022); *Brown v. Davenport*, 596 U.S. 118, (2022); *Cassano v. Shoop*, 10 F.4th 695, 696–697 (6th Cir. 2021) (Griffin, J., dissenting from denial of rehearing en banc) (collecting 22 earlier cases in which this Court reversed the Sixth Circuit "for not applying the deference to state-court decisions mandated by AEDPA"). And, these reversals only scratch the surface of the Sixth Circuit's defiance. *See e.g., Shoop v. Cunningham*, 143 S. Ct. 37 (2022) (Thomas, J., dissenting from denial of certiorari); *Shoop v. Cassano*, 142 S. Ct. 2051 (2022) (Thomas, J., dissenting from denial of certiorari); *Rapelje v. Blackston*, 577 U.S. 1019 (2015) (Scalia, J., dissenting from denial of certiorari). "That court's record of 'plain and repetitive' AEDPA error is an insult to Congress and a disservice to the people of Michigan, Ohio, Kentucky, and Tennessee." *Cunningham*, 143 S. Ct. at 44. The Sixth Circuit can and must do more to correct its own errors. *See id*.
>
> Some "reluctance in deploying en banc review is understandable," but "only to a point." *Id.* at 45. "The Sixth Circuit's habeas problems are well past that point— as evidenced by the depressing regularity with which petitions like this one reach us." *Id*. When wayward panels refuse to apply AEDPA, hopefully, the Sixth

>Circuit will correct its errors by rehearing the case en banc.  *See* 28 U.S.C. § 46(c);
>Fed. Rule App. Proc. 40(c).

*Id.* at 97 (citation modified).

The "Federal Rules of Appellate Procedure provide an important and necessary remedy for courts of appeals to correct their conflicts and errors of exceptional importance."  *Cassano*, 10 F.4th at 697 (citing what is now Fed. R. App. P. 40(b)(2)).  The majority opinion in this case clearly warrants en banc review so that we may fulfill our duty to "secure or maintain uniformity of the court's decisions" and answer a "question[] of exceptional importance."[1]  Fed. R. App. P. 40(b)(2).

This is a textbook case of self-defense entitling defendants to qualified immunity.  Under the majority opinion, however, local and state law enforcement can no longer use deadly force when an armed and dangerous suspect repeatedly reaches for or even removes a firearm from his waist.  Instead, they must now wait to see whether the suspect intends to surrender his weapon or use it against them before they may respond with deadly force.

But this holding stands in irreconcilable conflict with our past decisions, under which an officer need not face the business end of a gun to use deadly force, "even if facts beyond his knowledge meant that he actually faced no threat."  *Thomas v. City of Columbus*, 854 F.3d 361, 366–67 (6th Cir. 2017); *Mullins v. Cyranek*, 805 F.3d 760, 768 (6th Cir. 2015) ("[W]e do not think it is prudent to deny police officers qualified immunity in situations where they are faced with a threat of severe physical injury or death and must make split-second decisions, albeit ultimately mistaken decisions, about the amount of force necessary to subdue such a threat.").

What matters—and has always mattered—is whether officers could reasonably conclude that a suspect might fire a gun at them and therefore had probable cause that made their shooting lawful.  *Puskas v. Delaware County*, 56 F.4th 1088, 1096 (6th Cir. 2023) (collecting cases); *see also Cunningham v. Shelby County*, 994 F.3d 761, 764, 766–67 (6th Cir. 2021).  And, here, officers

---

[1]Despite our infamous reversal rate by the Supreme Court, *see* Mark Walsh, *A Sixth Sense: The 6th Circuit Has Surpassed the 9th as the Most Reversed Appeals Court*, A.B.A. J., Dec. 2012, at 15–16, our court has invoked our rehearing en banc procedure in only a handful of cases in recent years—by my count, twice in 2025, five times in 2024, four times in 2023, twice in 2022, three times in 2021, and three times in 2020.

could certainly conclude that Stephen Romero might fire a gun at them and, thus, they were entitled to qualified immunity. *See generally Romero v. City of Lansing*, 159 F.4th 1002, 1016–17 (6th Cir. 2025) (Griffin, J., concurring in part and dissenting in part) (recounting the facts as demonstrated by video evidence, which, among other things, shows officers ordering Romero to get face down on the ground, which he never did; Romero grabbing for a gun in his waistband, of his own accord and unexpectedly, mere feet away from the officers; and Romero reaching for the gun a second time, even after being shot for doing so before, and this time removing it from his waistband).

Plaintiff bears the burden to show that defendants were not entitled to qualified immunity. *Cunningham*, 994 F.3d at 765. She must establish that the officers violated decedent's constitutional right and that the right violated was clearly established to "all but the plainly incompetent." *District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). She has not met her burden on either prong of qualified immunity. That she failed to do so at the motion-to-dismiss stage is of no consequence because all relevant evidence is chronicled in the body-camera videos. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (stressing that qualified immunity is to be decided at the "earliest possible" juncture); *see also Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022). By deciding otherwise, the majority opinion contravenes our precedent.

The irresponsible and dangerous majority opinion also raises an issue of exceptional importance, as it puts local and state police officers in our Circuit in an impossible situation: Going forward, they must voluntarily assume a high level of personal risk—of being shot by an armed and dangerous suspect who is grabbing for and then raising his firearm mere feet away. They also risk incurring substantial personal financial liability if they engage in self-defense under these circumstances. Rehearing en banc should have been granted to rectify the majority's exceptional, and alarming, error that gravely endangers our officers and our communities.

For these reasons, I would grant rehearing en banc and therefore respectfully, and regrettably, dissent.

_____

**DISSENT**

_____

THAPAR and HERMANDORFER, Circuit Judges, dissenting from the denial of rehearing en banc. If turning back the clock were possible, everyone involved in this case would. In a perfect world, no one would be threatened by domestic violence, no one would need to make a split-second decision whether to stave off deadly force by using deadly force, and no one would have to witness a loved one's shooting death. And in a perfect world, judges would generally agree on whether force was justified in a fast-moving situation.

But settled qualified-immunity rules reflect that instead, we live in the real world, where officers must respond to volatile and violent situations with little lead time and no margin for error. They do so by permitting suit only on a showing that officers violated clearly established law in the specific circumstances they faced. That essential limit, the Supreme Court has reiterated, ensures officers can faithfully perform in the field without fear of being second-guessed by courts wielding the benefit of hindsight.

The panel decision denying qualified immunity misapplied settled rules and repeated common errors. Our en banc court should have remedied that deviation from Supreme Court and this court's precedent. We respectfully dissent from the decision not to do so.

I.

The officers in this case faced dangers that most of us can't imagine. For starters, this was a domestic-violence call—one of the most dangerous calls an officer can receive. *See United States v. Rahimi*, 602 U.S. 680, 707 (2024) (Sotomayor, J., concurring) (observing that domestic-violence calls "caus[e] more officer deaths with a firearm than any other type of call"); *Stimmel v. Sessions*, 879 F.3d 198, 210 (6th Cir. 2018) ("[R]esponding to family violence calls is among a police officer's most risky duties.").

This case was no exception. Stephen Romero's wife, Ashly, had called 911 to report a domestic disturbance. A second caller said that a woman was shot at the residence, so the

dispatcher told the officers, "It's going to be a confirmed shooting." Kurtz BWC 1:24.  A third caller allegedly clarified there was no shooting, but it appears dispatch couldn't tell the officers in time.  Either way, this was a precarious situation with an armed suspect.  So the officers approached with their guns drawn.

They arrived to find a suspect who refused to comply with their repeated orders to get on the ground.  Indeed, the officers told Romero that if he didn't get on the ground, they would shoot. After Romero went to his knees, he reached across his body for a firearm in his waistband.  The officers shot him.  Even after being shot, Romero continued to reach for his gun.  The officers again ordered him to stop.  But he didn't, so they shot him again.  The whole confrontation took place in less than 30 seconds.

Despite all that, the panel majority called Romero "largely compliant."  *Romero v. City of Lansing*, 159 F. 4th 1002, 1010 (6th Cir. 2025).  That's because he said, "I got you."  *Id.*  According to the majority, the Oxford English Dictionary tells us that means Romero was going to comply with the officers' orders.  *Id.* at 1011.  Yet against what Romero said, consider what he did:  At the same time, he tried to pull a gun from his waistband, just a few feet away from the officers and his wife.  Officers need not take an armed suspect at his word when his actions show the opposite. What's more, the officers had ordered Romero to "stop."  No dictionary is needed to understand that command.  Still, Romero didn't comply with it.  So the officers reasonably perceived a serious threat to their lives (not to mention Ashly's) when Romero reached for his gun.

## II.

## A.

Qualified immunity exists to protect officers who must make these potentially deadly split-second decisions from liability.  So our doctrine grants judges a narrow role.  That role doesn't include second-guessing an officer's decisions with the "20/20 vision of hindsight."  *Kisela v. Hughes*, 584 U.S. 100, 103 (2018) (per curiam) (quotation omitted).  Instead, we ask whether an officer's conduct violated "clearly established" rules that "placed" the "constitutional question beyond debate."  *Id.* at 104 (quotation omitted).  That way, liability runs only to "the plainly incompetent or those who knowingly violate the law"—not to an officer who happens to fall on

the wrong side of a fine line within a "hazy legal backdrop." *Mullenix v. Luna*, 577 U.S. 7, 12, 14 (2015) (per curiam) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). That "exacting standard gives government officials breathing room to make reasonable but mistaken judgments." *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quotation omitted).

How should courts determine whether a constitutional rule is sufficiently "clear[]" such that the "constitutional question [is] beyond debate"? *Kisela*, 584 U.S. at 104. There, too, the Supreme Court's directives are "settled." *City of Tahlequah v. Bond*, 595 U.S. 9, 13 (2021) (per curiam). "It is not enough that a rule be suggested by then-existing precedent." *Id.* at 12. Instead, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix*, 577 U.S. at 12 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). That involves a high "degree of specificity" achieved only by looking to "the specific context of the case," not assessing the right "as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

In short, the "clearly established" standard "requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (emphasis added). And abiding by that rule is "particularly important in excessive force cases." *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam). That's because when officers must make split-second decisions in the field, they don't have the luxury of time to study the penumbras of the caselaw, let alone apply it to the new facts unfolding in front of them. Freezing officers with fear of after-the-fact fault-finding "unduly inhibit[s]" their ability to respond in fluid and dangerous situations. *Ziglar v. Abbasi*, 582 U.S. 120, 150 (2017) (quotation omitted). So the "clearly established law" requirement grants officers essential protection that advances public safety.

B.

The command "not to define clearly established law at a high level of generality" may seem straightforward enough. *Emmons*, 586 U.S. at 42 (quotation omitted). But time after time, lower courts have disregarded it. These recurring level-of-generality errors have, in turn, prompted Supreme Court intervention. Indeed, other than "plain and repetitive" misapplication of habeas

rules, *Parker v. Matthews*, 567 U.S. 37, 49 (2012) (per curiam), it's hard to identify an analytical misstep by circuits that has generated more uniform (and summary) rebuke.[1]  Nor has the problem's "repeated[]" nature escaped the Supreme Court's notice.  *al-Kidd*, 563 U.S. at 742 (collecting cases); *see also, e.g.*, *Bond*, 595 U.S. at 12 ("We have repeatedly told courts not to define clearly established law at too high a level of generality."); *Wesby*, 583 U.S. at 63 ("repeatedly stressed"); *Kisela*, 584 U.S. at 104 ("repeatedly told" (quotation omitted)); *Mullenix*, 577 U.S. at 12 ("repeatedly told" (quotation omitted)); *Sheehan*, 575 U.S. at 611 ("repeatedly told" (quotation omitted)); *Plumhoff*, 572 U.S. at 779 ("repeatedly told" (quotation omitted)).

We believe the panel's opinion commits the latest in a long line of level-of-generality fouls. Stepping through its analysis shows why.  The opinion describes the officers' bodycam footage and notes the need to draw all potentially disputed facts in the plaintiff's favor.  *Romero*, 159 F.4th at 1007–08.  Then, citing those facts—and because more litigation *could* yield more hypothetical evidence about whether the officers' use of force was reasonable—the panel concludes that the "inconclusive" video might reasonably be interpreted to show that Romero was attempting to surrender his weapon by reaching for it.  *Id.* at 1013–14.  From there, the opinion denies qualified immunity based on cases holding that "individuals have a right not to be shot unless they are perceived as posing a threat to officers or others."  *Id.* (quoting *King v. Taylor*, 694 F.3d 650, 664 (6th Cir. 2012)).

But viewing the encounter through the lens of "non-threatening suspect" raises the level of generality too high.  As other use-of-force decisions show, it's not enough to rest on the "general proposition that force must be justified."[2]  *Mullenix*, 577 U.S. at 16.  To deny qualified immunity,

---

[1]*See, e.g.*, *Bond*, 595 U.S. at 12–13 (summary reversal); *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5–7 (2021) (per curiam) (summary reversal); *Emmons*, 586 U.S. at 43 (summary reversal); *Kisela*, 584 U.S. at 104 (summary reversal); *Wesby*, 583 U.S. at 63–65; *White v. Pauly*, 580 U.S. 73, 79–80 (2017) (per curiam) (summary reversal); *Mullenix*, 577 U.S. at 12 (summary reversal); *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (per curiam) (summary reversal); *Sheehan*, 575 U.S. at 611; *Carroll v. Carman*, 574 U.S. 13, 16–20 (2014) (per curiam) (summary reversal); *Wood v. Moss*, 572 U.S. 744, 759–61 (2014); *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014); *Stanton v. Sims*, 571 U.S. 3, 7–11 (2013) (per curiam) (summary reversal); *Reichle v. Howards*, 566 U.S. 658, 663–64 (2012); *al-Kidd*, 563 U.S. at 742; *Brosseau*, 543 U.S. at 198 (summary reversal).

[2]The Supreme Court has, in rare instances, denied qualified immunity when "a general constitutional rule . . . may apply with obvious clarity" to officers' conduct, even if there's no on-point precedent.  *Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (quotation omitted).  Such cases are "extreme" and the violation must be "obvious[]" and "particularly egregious."  *Id.* at 8–9 & n.2.  But this case is different.  As Supreme Court and federal appellate precedent show, *see*

we must instead conclude that "existing precedent squarely governs the specific facts at issue." *Emmons*, 586 U.S. at 42 (quotation omitted).  Here, those facts involved a suspect who officers knew was armed and believed had fired his weapon; was within ready striking distance of officers and a potential domestic-violence victim; provided at most mixed signals of intent to surrender; and at the same time repeatedly defied officers' clear orders by reaching for his gun.

With those facts in mind, resolving this case in the officers' favor is straightforward.  No case comes close to establishing that the officers were "plainly incompetent" for doubting the intentions of a non-compliant suspect reaching for a firearm.  *Malley*, 475 U.S. at 341.  Certainly, a "reasonable officer could miss the connection" between the cases the panel cites—none of which involve a suspect actively reaching for a gun against officers' clear orders[3]—"and this one." *Bond*, 595 U.S. at 14.  That is sufficient to grant the officers qualified immunity.

If more caselaw confirmation were needed, there is plenty.  Start with Supreme Court decisions, which confirm the appropriateness of granting qualified immunity for the use of force in this case.  *See, e.g.*, *id.* at 11–14 (granting qualified immunity to officers who shot a suspect wielding a hammer who ignored commands to drop it); *Kisela*, 584 U.S. at 101–02, 107–08  (same, but for suspect with a knife); *Sheehan*, 575 U.S. at 605–06, 611 (same).

Our cases cut the same way.  *See Romero*, 159 F.4th at 1023 (Griffin, J., concurring in part and dissenting in part); *see also, e.g.*,  *Eastep v. City of Nashville*, 156 F.4th 819, 829–30 (6th Cir.

---

*infra* pp. 7–8 & n.4, any violation is far from "obvious."  If anything, the "general constitutional rule" authorized the officers' use of force here.

[3]*See King*, 694 F.3d at 662–63 (denying qualified immunity to an officer who shot a man through his back door when the man was lying on his couch with a gun but evidence suggested that he never made "any threatening gestures" or even looked at the officer); *Bletz v. Gribble*, 641 F.3d 743, 753–54 (6th Cir. 2011) (same when an officer shot a man when "there was no imputation of past or potential future violence on the part of" the decedent, the officer had room to retreat, and the decedent was allegedly lowering his gun); *Heeter v. Bowers*, 99 F.4th 900, 913–15 (6th Cir. 2024) (same when officers shot a suicidal individual after he "moved slightly" and it was unclear whether a gun "was within reach"); *Leftwich v. Driscoll*, No. 22-1572, 2023 WL 3563207, at *3–4 (6th Cir. May 19, 2023) (same when officers, investigating a misdemeanor shot a man "only three seconds after he opened his front door while holding a pistol" even though the man "made no threatening remarks" and never "pointed his pistol at anyone"); *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) (same when an officer struck a suspect's head and knee with a baton after the suspect, who had no weapons, "came out from behind the bushes with his hands straight up in the 'surrender' position"); *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996) (opining in dicta that officers wouldn't be entitled to qualified immunity if they shot a man who "had simply walked slowly to the front door, with his hands at his side").

2025) (granting qualified immunity when officers shot a suspect who "consistently and repeatedly disobeyed [officers'] commands to drop his weapon," stepped toward them, and pointed an object at them); *Puskas v. Delaware County*, 56 F.4th 1088, 1096–99 (6th Cir. 2023) (same when officers responding to a domestic-violence call shot a suspect who had threatened his wife with guns and knives, had access to those weapons, repeatedly disobeyed officers' orders, and appeared to pull out a gun); *Cunningham v. Shelby County*, 994 F.3d 761, 764–66 (6th Cir. 2021) (same when officers shot a woman who walked toward them and raised what looked like a .45-caliber pistol but turned out to be a BB handgun); *Jordan v. Howard*, 987 F.3d 537, 539 (6th Cir. 2021) (same when officers shot a man who was sleeping in his car with a gun on his lap, didn't comply "with their orders that he keep his hands up and away from the gun," and instead "grabbed the gun" and swung it towards the officers); *Hicks v. Scott*, 958 F.3d 421, 435–37 (6th Cir. 2020) (same when an officer shot a suspect who pointed a rifle at her face from five feet away); *Reich v. City of Elizabethtown*, 945 F.3d 968, 977–82 (6th Cir. 2019) (same when officers shot a mentally ill man with a knife who didn't put his knife down when the officers commanded him to and then took another step toward the officers); *Baker v. City of Trenton*, 936 F.3d 523, 528–29, 532–35 (6th Cir. 2019) (same when an officer shot a man whom the officer believed was holding his mother hostage and who struck the officer with a lawnmower blade); *Mitchell v. Schlabach*, 864 F.3d 416, 418–19 (6th Cir. 2017) (same when an officer shot a man who "appeared to be unarmed," but was "walking aggressively" and didn't obey the officer's commands to stop); *Thomas v. City of Columbus*, 854 F.3d 361, 363, 366–67 (6th Cir. 2017) (same when an officer shot an apparently armed fleeing suspect 10 feet away from him even though the suspect's gun was unloaded); *Mullins v. Cyranek*, 805 F.3d 760, 762, 765–69 (6th Cir. 2015) (same when an officer shot a suspect who resisted a stop-and-frisk, had a gun in his hand with his finger on the trigger, and threw the gun); *Simmonds v. Genesee County*, 682 F.3d 438, 441–42, 446 (6th Cir. 2012) (same when officers shot a suspect who yelled that he had a gun and appeared to point his gun at them from his car); *Untalan v. City of Lorain*, 430 F.3d 312, 313–17 (6th Cir. 2005) (same when officers shot a suspect who grabbed a butcher knife, barricaded himself in his kitchen, lunged at officers, stabbed an officer, and wrestled with officers for control over the knife); *Boyd v. Baeppler*, 215 F.3d 594, 601–04 (6th Cir. 2000) (same when an officer shot a man who didn't stop when ordered to and then pointed a gun at the officer, and when another officer continued shooting the man after

he "went down" because the man refused to drop his gun despite the officers' commands); *Rhodes v. McDannel*, 945 F.2d 117, 118, 120 (6th Cir. 1991) (per curiam) (same when an officer shot a domestic-violence suspect who ignored orders and approached the officer with a raised machete).

And the same is true for every other circuit's precedent.[4]

---

[4]*See, e.g., Bannon v. Godin*, 99 F.4th 63, 67 (1st Cir. 2024) (granting qualified immunity when officers shot an armed suspect who ignored repeated commands to show his hands and reached for his gun), *cert. denied*, 145 S. Ct. 1048 (2025), *reh'g denied*, 145 S. Ct. 1347 (2025); *Conlogue v. Hamilton*, 906 F.3d 150, 152–54 (1st Cir. 2018) (same when an officer shot a man who pointed a gun at officers after "continued warnings to put down his weapon and cooperate with the police"); *Rose v. City of Utica*, 777 F. App'x 575, 576 (2d Cir. 2019) (same when an officer shot a suspect who "did not react to an approaching officer's command to drop his weapon" and "turned toward the officer while" holding a shotgun); *Est. of Jaquez ex rel. Pub. Adm'r of Bronx Cnty. v. City of New York*, 706 F. App'x 709, 712, 714–15 (2d Cir. 2017) (same when officers shot a domestic-violence suspect who "had easy access to a fillet knife" and "was refusing to obey the officers' commands"); *James v. N.J. State Police*, 957 F.3d 165, 166–68 (3d Cir. 2020) (same when a state trooper shot a man holding a gun to his own head after the man twice refused to drop the gun and told officers to "stay away from [him]"); *Carswell v. Borough of Homestead*, 381 F.3d 235, 237–38 (3d Cir. 2004) (same when an officer shot a domestic-violence suspect who ran toward the officer with empty hands); *Benton v. Layton*, 139 F.4th 281, 285–91 (4th Cir. 2025) (same when an officer shot a driver who ignored "six clear commands" and reached his hand toward what officers reasonably perceived to be a gun), *cert. denied*, 2026 WL 79874 (U.S. Jan. 12, 2026); *Caraway v. City of Pineville*, 111 F.4th 369, 373–75 (4th Cir. 2024) (same when officers shot a man who disobeyed their commands to put his hands up and reached into his jacket for a gun); *Batyukova v. Doege*, 994 F.3d 717, 721–23, 726 (5th Cir. 2021) (same when an officer shot an unarmed suspect who ignored repeated commands and "reached for her waistband" while walking toward the officer); *Garcia v. Blevins*, 957 F.3d 596, 602 (5th Cir. 2020) (same when an officer shot an armed suspect who "ignored [his] commands to drop the weapon" and walked toward other civilians); *Pam v. City of Evansville*, 154 F.4th 523, 527, 531–34 (7th Cir. 2025) (same when an officer shot an armed suspect who ignored repeated commands to get on the ground); *Doxtator v. O'Brien*, 39 F.4th 852, 858, 861–64 (7th Cir. 2022) (same when an officer shot an unarmed arrestee who pretended to have a gun under his shirt, tried to escape, and ignored repeated commands to put his hands up); *Klum v. City of Davenport*, 145 F.4th 907, 909, 912–14 (8th Cir. 2025) (same when an officer shot an armed man who wandered through a neighborhood while "evading arrest and ignoring officer commands to drop [his] weapon"); *Dimock ex rel. Dimock-Heisler v. City of Brooklyn Center*, 124 F.4th 544, 549, 554 (8th Cir. 2024) (same when officers shot a domestic-disturbance suspect who was holding a knife and ignored "multiple" orders to "drop the knife" and "[g]et down on the ground"); *Napouk v. L.V. Metro. Police Dep't*, 123 F.4th 906, 912, 920 (9th Cir. 2024) (same when officers shot a man armed with a purported machete who "refused to follow the officers' orders to stop moving towards them and to drop the weapon"); *Waid v. County of Lyon*, 87 F.4th 383, 386, 389 (9th Cir. 2023) (same when officers responding to a domestic-violence call shot a suspect who "used aggressive language with the officers, ignored an order from the officers, and rushed towards them in a small and confined space"); *Alcala v. Ortega*, 128 F.4th 1298, 1303–04 (10th Cir. 2025) (same when an officer shot an unarmed man who pretended to brandish a gun and "repeatedly . . . failed to comply" with police orders); *Palacios v. Fortuna*, 61 F.4th 1248, 1254–55, 1259 (10th Cir. 2023) (same when officers shot an armed suspect who reached for his gun multiple times after "at least eighteen" warnings to "'drop it or show his hands'"); *Franklin v. Popovich*, 111 F.4th 1188, 1191–92 (11th Cir. 2024) (same when an officer shot a prone, wounded suspect whom the officer believed to be armed and who "made a sudden movement" after the officer ordered him to "[r]emain still"); *Powell v. Snook*, 25 F.4th 912, 916–18 (11th Cir. 2022) (same when an officer responded to a domestic-violence call at the wrong home and shot a homeowner who "started to raise his" pistol and "got [it] hip-high"); *Fenwick v. Pudimott*, 778 F.3d 133, 135, 138–40 (D.C. Cir. 2015) (same when three federal marshals shot a man who was attempting to flee in his vehicle after he clipped a deputy and repeatedly ignored orders to stop but "posed no immediate threat to either officers or bystanders").

C.

Some cases present factual or procedural baggage that counsels against resolving qualified immunity early.  This case isn't one of them.

The panel opinion's focus on the pleading-stage posture doesn't shield its analysis.  *See Romero*, 159 F.4th at 1014 ("Without the benefit of the full record, it is difficult to make definitive conclusions about factual parallels.").  To be sure, our court has (perhaps incorrectly) expressed a "general[]" disfavor for granting a motion to dismiss based on qualified immunity.  *See, e.g.*, *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015).  *But see Crawford v. Tilley*, 15 F.4th 752, 765 (6th Cir. 2021) (questioning that precedent because the Supreme Court has "nowhere" "suggest[ed] that it [is] inappropriate to dismiss a complaint on qualified immunity or that there should be a presumption against it").  But "[q]ualified immunity is an *immunity from suit* rather than a mere defense to liability."  *Scott v. Harris*, 550 U.S. 372, 376 n.2 (2007) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  So when a claim is destined to fail, we should say so "at the earliest possible stage."  *Id.* (quotation omitted).  The Supreme Court seems to agree, having repeatedly granted qualified immunity in the motion-to-dismiss posture.  *See, e.g.*, *Wood*, 572 U.S. at 754–55, 759–61; *al-Kidd*, 563 U.S. at 734, 742.

Here, no amount of additional evidence or factfinding would change the analysis of whether the officers violated clearly established law.  The bodycam footage—relied on both by plaintiff and the panel majority—speaks for itself.  And it shows that (i) Romero attempted to reach for his gun a second time despite the officers' insistence that he show his hands and get face-down on the ground, and (ii) Romero, although wounded, was physically capable of accessing and gripping his gun.  *Compare Romero*, 159 F.4th at 1007, *with id.* at 1016–17 (Griffin, J., concurring in part and dissenting in part) (agreeing on these facts).  There's no way to alter or erase those aspects of the encounter, "even if all the disputed facts are viewed in [plaintiff's] favor."  *Sheehan*, 575 U.S. at 616.  And as mentioned, no cases establish that using force against a suspect reaching for a gun against officers' orders violates clearly established law.

None of that is to discount the additional problems with the panel's qualified-immunity and excessive-force analysis—problems our dissenting colleagues detail well.  *See Romero*, 159

F.4th at 1018–23 (Griffin, J., concurring in part and dissenting in part); *infra* at 21–24 (Bush, J., dissenting from the denial of rehearing en banc); *infra* at 27–31 (Readler, J., dissenting from the denial of rehearing en banc).  But whatever else might be said for or against the panel's opinion, its level-of-generality failing is sufficient to entitle the officers to qualified immunity as a matter of law.  That dispositive result follows even if this case carries other complexities seen fit to sidestep—an approach the Supreme Court has approved time and time again.[5]

III.

Accepting that the panel opinion gets the level of generality wrong, we must ask whether that error warrants en banc review.  We think so.  The panel's misstep means a case that should end will go forward.  And the repercussions will reverberate throughout our circuit.  When we make mistakes in qualified-immunity cases from the comfort of our chambers, we make officers play roulette with their lives.  So the stakes couldn't be higher for public safety.  And the break from our precedent and Supreme Court precedent couldn't be clearer.  The result?  More confusion for officers.

En banc review is also appropriate given the recurring nature of the relevant error.  A panel's failure to define rights at the proper level of specificity isn't some one-off misstep.  It's among the legal errors most corrected—and called out—in recent Supreme Court history.  *See supra* n.1 (collecting 16 cases).

---

[5]*See, e.g.*, *Bond*, 595 U.S. at 12 ("We need not, and do not, decide whether the officers violated the Fourth Amendment in the first place [because] the officers plainly did not violate any clearly established law."); *Rivas-Villegas*, 595 U.S. at 5–7 (addressing only the clearly established prong); *Emmons*, 586 U.S. at 43–44 (same); *Kisela*, 584 U.S. at 103–04 ("[T]he Court need not, and does not, decide whether [the officer] violated the Fourth Amendment [because the officer] was at least entitled to qualified immunity."); *White*, 580 U.S. at 78–81 (addressing only the clearly established prong); *Mullenix*, 577 U.S. at 11 ("We address only the qualified immunity question, not whether there was a Fourth Amendment violation in the first place . . . ."); *Barkes*, 575 U.S. at 825 (addressing only the clearly established prong); *Sheehan*, 575 U.S. at 613 (same); *Carroll*, 574 U.S. at 20 (same); *Stanton*, 571 U.S. at 10–11 ("[W]hether or not the constitutional rule applied by the court below was correct, it was not beyond debate." (quotation omitted)); *Reichle*, 566 U.S. at 669 n.6 (sidestepping the first qualified-immunity question because "[i]t suffices, for qualified immunity purposes, that the answer would not have been clear to a reasonable official"); *Brosseau*, 543 U.S. at 198 (expressing "no view as to the correctness of the Court of Appeals' decision on the constitutional question itself" because no clearly established law governed the case).

\*    \*    \*

The recent err-reverse-repeat cycle in qualified-immunity cases suggests that there's some chance (perhaps even a good one) that the Supreme Court will yet again see fit to intervene on the level-of-generality issue if asked.  But we shouldn't offload the error-correction burden to a Court with more pressing business than telling us the same thing over and over again.  Our circuit is responsible for following the law; sometimes, that means policing our own errors.  With lives on the line, we owe the police and the public that much.

_____

**DISSENT**

_____

JOHN K. BUSH, Circuit Judge, dissenting from the denial of rehearing en banc. The relevant indisputable facts, based on the complaint and video, bear repeating because they decide this case. Late one December night, plaintiff Ashly Romero called 911 over a domestic dispute that turned violent. *Romero v. City of Lansing*, 159 F.4th 1002, 1006 (6th Cir. 2025). Officers raced to the scene, having been told that shots were fired. *Id.* When they arrived, they found a male suspect standing by his car. *Id.* at 1007. The officers drew their weapons and ordered the suspect to the ground. *Id.* He refused. *Id.* Officers ordered the suspect to the ground once more. *Id.* He then dropped to his knees, but when officers told him to lay face down, he refused. *Id.* Instead, the suspect lifted his shirt, which exposed a holstered firearm. *Id.* As he reached for that gun, officers shot him. *Id.* Undeterred, the suspect reached for his gun once more, and officers shot again. *Id.* The encounter lasted less than a minute. *Id.* The suspect died at the scene. *Id.* Plaintiff then sued, claiming that the officers responding to her 911 call used excessive force. *See id.*

This should have been an easy case. Officers have "mere seconds to assess the potential danger" of an armed suspect, so qualified immunity protects them if they shoot someone whom a "competent officer would" reasonably believe poses a lethal threat. *Kisela v. Hughes*, 584 U.S. 100, 105–06 (2018) (per curiam). No case requires officers to sit idly by as they stare down the barrel of a non-compliant suspect's gun. The majority should have granted qualified immunity.

But it did not, and the en banc court declines to step in. In so doing, we let stand a precedential opinion that seemed to apply an unsupported presumption against qualified immunity at the pleadings stage, defied the relevant circuit and Supreme Court precedent, and improperly second-guessed the officers' judgment from the peace of our chambers. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Because we should have taken this case en banc, I respectfully dissent.

\*          \*          \*

The majority's decision errs when it appears to apply an unwarranted presumption against dismissal based on qualified immunity. The majority's decision asserts that "[o]ur circuit disfavors granting qualified immunity at the motion-to-dismiss stage" because there is no "factual development beyond the allegations in [the] complaint . . . ." *Romero*, 159 F.4th at 1008 (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)). It explains that even if "videos" recorded of the encounter "will likely be dispositive evidence at summary judgment or trial," they may not be at the pleadings stage. *Id.* And it reasons that "summary judgment" is "a posture far less favorable to plaintiffs than the motion-to-dismiss context" in qualified immunity cases. *Id.* at 1011. In short, the majority holds that an officer should have a harder time receiving qualified immunity at the pleadings stage than at other stages of the case, even when the facts are identical. This apparent presumption against qualified immunity is unsupported.

To begin with, the presumption appears to derive from a concurrence that did not squarely address the issue. It appears that the first case adopting the presumption, *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015), relied on a line from Chief Judge Sutton's concurrence in *Evans-Marshall*, 428 F.3d at 235 (Sutton, J., concurring). *See Wesley*, 779 F.3d at 433–34. He observed that we are forced to rely on "the allegations in [the] complaint," which can make it difficult to "fairly tell whether a case is 'obvious' or 'squarely govern[ed]' by precedent . . . ." *Evans-Marshall*, 428 F.3d at 235 (Sutton, J., concurring) (cited in *Wesley*, 779 F.3d at 434). But that statement just recognizes the reality that a plaintiff has an inherent advantage at the pleadings stage because we take the plaintiff at her word and view the case on her terms. It does not mean that we must put *an additional* thumb on the scale in her favor.

In addition, the presumption lacks theoretical support. At both the pleadings and summary judgment stages, we view the facts in the light most favorable to the non-moving party. *Christopher v. Harbury*, 536 U.S. 403, 406 (2002); *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam). But in qualified immunity cases, we may reject a plaintiff's story as implausible (at the pleadings stage) or incapable of persuading a reasonable jury (at the summary judgment stage) when "the videos are clear and blatantly contradict or utterly discredit the plaintiff's version of

events." *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)) (cleaned up).[1]  And all else being equal, a reasonable inference at the pleadings stage will remain reasonable at the summary judgment stage.  *See Akima v. Peca*, 85 F.4th 416, 422 (6th Cir. 2023) ("[W]e continue to construe factual disputes . . . in the light most favorable to the plaintiff . . . .").  Therefore, assuming the facts are the same at both stages, if a video at the summary judgment stage is enough to grant judgment for the officer, it should be at the pleadings stage, too.[2]

To be clear, I am not suggesting that standards of review in qualified immunity cases should be the same at the pleadings and summary judgment stages.  I am suggesting only that if the summary judgment evidence viewed in the light most favorable to the plaintiff is identical to the allegations in the complaint viewed, consistent with video footage, in the light most favorable to the plaintiff, then the analysis should come out the same way.  The mere fact that we are at the pleadings stage should not make it *harder* for the officers to get qualified immunity if, as the majority suggests, the "video[] will likely be dispositive evidence at summary judgment." *Romero*, 159 F.4th at 1008.

Indeed, not only is the presumption unsupported, but it appears to be inapplicable to this case.  Some of our cases have limited the apparent presumption against qualified immunity to the clearly established prong of qualified immunity.  *See Hart v. Hillsdale Cnty.*, 973 F.3d 627, 635 (6th Cir. 2020).  But "no such preference applies to the violation-of-a-constitutional-right prong." *Crawford v. Tilley*, 15 F.4th 752, 764 (6th Cir. 2021).  So even if the case law supported a

---

[1]The Second, Fourth, Fifth, Seventh, and Eleventh Circuits also consider video evidence at the pleadings stage. *See Perdomo v. City of League City*, 163 F.4th 921, 923–24 (5th Cir. Jan. 2026); *Doriety ex rel. Est. of Crenshaw v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024); *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024); *Baker v. City of Madison*, 67 F.4th 1268, 1277–78 (11th Cir. 2023); *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017).  The practice of considering video evidence that contradicts allegations in a complaint is analogous to the practice in commercial disputes of allowing a contract to trump allegations in the complaint when the two contradict each other. *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 537 (6th Cir. 2017).  Also, the parties stipulated to use of the video to review the motion to dismiss. *See Romero v. City of Lansing*, 159 F.4th 1002, 1008 (6th Cir. 2025).

[2]Like Judge Readler, I find it almost inconceivable that any evidence developed on remand could overcome the unusually clear body cam footage in this case. *See* Readler Dissent at 26–29.  And it is that unusual clarity that renders any contrary allegations in the complaint facially implausible.

presumption against qualified immunity, it would not have applied to the underlying question of whether the officers violated the decedent's Fourth Amendment rights.

This apparent re-write of the rules governing motions to dismiss would have been reason enough to rehear this case en banc. But the majority goes even further astray when it analyzes the merits of the officers' qualified immunity defense.

In *Cunningham v. Shelby County*, we faced a case that was fundamentally identical to this one—officers were called to respond to an armed and potentially violent person, the person was facing away from the officers, officers told her to drop the gun, she turned towards the officers and started to raise the gun, and the officers shot her. 994 F.3d 761, 763–64, 767 (6th Cir. 2021). This court granted qualified immunity. *Id.* But here, the majority denied qualified immunity. I find it hard to square that holding with *Cunningham*. Officers in this situation—dealing with someone whom they thought was violent and who pointed a gun in the officers' general direction—are entitled to qualified immunity. *White v. Pauly*, 580 U.S. 73, 78 (2017) (per curiam); Thapar & Hermandorfer Dissent at 14–16 & n.4 (collecting over three dozen cases from every regional circuit supporting this proposition). And the Supreme Court has summarily reversed at least two courts for denying qualified immunity in similar circumstances. *See id.*; *Kisela*, 584 U.S. at 103–04.

The majority's cited cases do not undercut *Cunningham*. For example, in *Lee v. Russ*, we denied qualified immunity to officers who shot a man who was holding a knife while standing 30 feet away from the officers. 33 F.4th 860, 862–63 (6th Cir. 2022). But the use of force in *Lee* was plainly excessive because a knife's kill range is far shorter than 30 feet. And in *Bletz v. Gribble*, the decedent *lowered* his gun before the officers shot him. 641 F.3d 743, 748 (6th Cir. 2011). Here, the decedent *reached for* his gun before the officers shot him.

\*                 \*                 \*

For decades, the Supreme Court has told us to be deferential to officers when reviewing excessive force claims. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)) (cleaned up). "[P]olice officers are often

forced to make split-second judgments," and their decisions may turn out to be "mistakes" "when[] judged with the benefit of hindsight . . . ." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015) (first quoting *Plumhoff v. Rickard*, 572 U.S. 765, 775 (2014); and then quoting *Heien v. North Carolina*, 574 U.S. 54, 61 (2014)). That does not, however, make their conduct unreasonable under the Fourth Amendment. "To be reasonable is not to be perfect," and officers have "fair leeway for enforcing the law in the community's protection." *Heien*, 574 U.S. at 60–61 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Regrettably, the majority ignored those commands and held the officers to an unreasonably high standard. For example, the majority focused intently on the decedent saying "I got you . . . I got you." *See Romero*, 159 F.4th at 1010; Readler Dissent at 29. Not only is that statement barely audible on the body cam footage,[3] but it is legally irrelevant. The Supreme Court has squarely held that officers are under no obligation to take the suspect at his word. *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018). So the fact that the suspect said "I got you . . . I got you" cannot turn the shooting into an unreasonable use of force.

More importantly, though, the majority spent an entire paragraph conducting the very "nuanced interpretation of [the decedent's] words" that the majority argues "is not appropriate," dissecting the decedent's words line by line and explaining why saying "I got you . . . I got you" rendered everything the officers did after unreasonable. *Romero*, 159 F.4th at 1011. Then, the majority conducted a detailed vocal and behavioral analysis, asserting that the decedent's "voice broke" during the encounter (something inaudible on the body cam footage), that he "had just audibly reacted to being shot" (another barely audible noise on the body cam footage), and that "any effort to draw and point his gun at the officers would have required significant contortion of his body" (something the body cam footage at least plausibly shows the decedent trying to do). *Id.* at 1010–11.

The panel painstakingly reviewed the body cam footage and decided this case based on nuances that I could barely detect in the comfort and solitude of my chambers, much less if I were

---

[3]This is itself a problem for the majority. In qualified immunity cases, we may "consider[] only the facts that were knowable to the defendant officers," and it is far from clear that they could have heard the decedent say this. *White v. Pauly*, 580 U.S. 73, 77 (2017) (per curiam).

a police officer responding in the heat of the moment. *Accord* Readler Dissent at 29–30. But even considering the factors unearthed by the majority's close analysis, I do not see how the officers, running to the scene of a domestic violence call in the middle of a frigid winter night and watching a man reach for his firearm after defying their instructions, were *un*reasonable in concluding that deadly force was necessary. After all, the suspect's "purported subjective intent to comply with the officers' requests" is irrelevant: "we view his actions *objectively*, from the perspective of a reasonable officer at the scene." *Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015); *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). The entire premise of the majority's analysis, then, squarely and directly conflicts with the relevant use of force precedents from our court and the Supreme Court. *Accord* Griffin Dissent at 7–9.

The Second Amendment undeniably "protect[s] an individual's right to carry a handgun for self-defense outside the home." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022). And that right does not, of course, go away simply because the police are nearby. Moreover, every death is tragic, no matter who it is or how it happens. *Accord* Readler Dissent at 26. Nobody wants the police to use deadly force, and the world would be a much better place if they did not need to. *Accord id.*

But officers responding to dangerous situations do not have time to conduct a textualist exegesis of a suspect's statements or frame-by-frame analysis of body language when the video undeniably shows the suspect reaching to unholster his firearm. Staring down the barrel of a gun less than 20 feet away from a non-compliant suspect, the officers reasonably believed they had two options: shoot or be shot. Plaintiff may well be right that the decedent was trying to communicate his compliance, but the officers did not violate the Fourth Amendment by choosing "shoot." *Accord* Readler Dissent at 31–33. The majority erred in second-guessing that split-second decision.

*         *         *

Judge Griffin's dissent from the panel's decision got it right, and this case satisfies the criteria for en banc review. I therefore respectfully dissent from the denial of rehearing en banc.

_____

**DISSENT**

_____

READLER, Circuit Judge, dissenting from the denial of rehearing en banc.  The facts here tell an all-too-common tale, one in which law enforcement faces uncertain and life-threatening circumstances.  After receiving a domestic violence call and being told that a woman had been shot, two officers arrive at the scene of the incident.  A woman's screams emanate from a car parked in the driveway.  Standing beside the vehicle is Stephen Romero.  Having already drawn their guns, officers command Romero to "get on the ground."  They do so not once, but at least six times.  Yet Romero refuses.  Instead, he kneels and lifts his shirt, revealing a firearm in his waistband.  Romero then reaches for the gun. Officers begin shooting.  Romero falls to the ground.  A second later, as he lies there, Romero again reaches for his gun.  Officers shoot once more, killing Romero.

I agree with my many colleagues who understandably wince at the dramatic consequences the panel majority's holding invites for law enforcement.  *See ante* at 8–9 (Griffin, J., dissenting from the denial of rehearing en banc); *ante* at 10–11 (Thapar & Hermandorfer, JJ., dissenting from the denial of rehearing en banc); *ante* at 23–25 (Bush, J., dissenting from the denial of rehearing en banc).  No one celebrates the sudden loss of life the Romero family regrettably has now experienced.  At the same time, we make the job of protecting the public all the more daunting by not awarding an officer qualified immunity when he acts to eliminate a mortal threat.

Yet just as problematic, from a legal perspective, is the panel majority's refusal to accept the conclusive nature of the video evidence here.  There are no disputes of fact over the rapid manner of the escalating events the video captures, including that just two seconds passed between the moment the officers first shot Romero and the moment he again reached for his gun.  The officers' decision to shoot Romero out of fear he was about to shoot them first is thus the quintessential "split-second judgment[]" officers must make on a routine basis, one for which we typically afford them qualified immunity.  *See Graham v. Connor*, 490 U.S. 386, 396–97 (1989).  The video likewise puts to rest any debate about the central thesis of the complaint:  that Romero was "shot dead" merely for "possess[ing] a gun."  *See* Am. Comp., R. 13, PageID 131, 141, 143.

The panel majority nonetheless sends this case ahead to discovery and, ultimately, for a "trier of fact" to determine whether the officers' actions were an unreasonable seizure in violation of the Fourth Amendment. *Romero v. City of Lansing*, 159 F.4th 1002, 1013 (6th Cir. 2025).

Two flawed premises seemingly drove that conclusion. One was the majority opinion's assessment that it had license to forgo "a detailed analysis" of the import of the video evidence because the panel was reviewing a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. *Id.* at 1008. Historically, in the mine-run excessive force case, a Rule 12(b)(6) motion may well have been a poor vehicle for resolving as a matter of law whether the facts as alleged fail to clearly establish a constitutional violation. *See Jones v. City of Cincinnati*, 521 F.3d 555, 559–61 (6th Cir. 2008). But the traditional benefit of the doubt we give a plaintiff with respect to a dispositive motion carries far less weight when, as is now often the case, video evidence provides us with "sufficient clarity" as to the reasonableness of the officer's conduct. *See Mendez v. City of Chicago*, 160 F.4th 888, 892 (7th Cir. 2025); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (establishing the blatant contradiction standard when considering a Rule 56 motion); *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022) (extending *Scott*'s blatant contradiction standard to the 12(b)(6) setting); *ante* at 21–23 (Bush, J., dissenting from the denial of rehearing en banc). That well describes the video here, which reveals the entire scene from two camera angles, allowing us to view and hear in real time what the officers encountered. Looking more broadly, the growing number of officer-related cases from across the circuits that accept video evidence as a basis to award qualified immunity at the Rule 12(b)(6) stage are no surprise given the fact that most law enforcement encounters are now captured on video. *See Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 600 (6th Cir. 2025) (collecting sources on the ubiquity of body cams and other recording devices in modern police departments); *see also Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (per curiam) (considering video evidence under Rule 12(b)(6)); *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024) (same); *Baker v. City of Madison*, 67 F.4th 1268, 1277–78 (11th Cir. 2023) (same); *cf. Kass v. City of New York*, 864 F.3d 200, 212 (2d Cir. 2017) (considering video evidence under the Rule 12(c), which follows "the same standard as that applicable to a motion under Rule 12(b)(6)," *id.* at 206). So dated precedents reflexively denying a motion to dismiss in excessive force cases due to the absence of video evidence say little about

modern day jurisprudence in the body and dash cam era. *See Bell*, 37 F.4th at 364; *Brown v. Giles*, 95 F.4th 436, 440–41 (6th Cir. 2024) (plurality opinion).

Resisting that conclusion, the majority opinion conjectured that "[t]he fact that videos will likely be dispositive evidence at summary judgment or trial does not mean we have the authority to conduct a detailed analysis now." *Romero*, 159 F.4th at 1008 (citing *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1002 n.4 (6th Cir. 2024)). But why not? If the events reflected on a video pose a legal question, for instance, the permissibility of the force used by officers, our job is to provide an answer. *See Scott*, 550 U.S. at 381 n.8 (recognizing the question of the reasonableness of an officer's actions is a "pure question of law"); *Brown*, 95 F.4th at 441 (deciding an officer's use of force was reasonable as a matter of law in the Rule 12(b)(6) context). Take today's case, where the majority opinion posits that discovery (and perhaps even a trial) may alter the supposed fact dispute the majority opinion identifies: whether Romero's conduct was threatening in nature. How so? Nothing about the video will change during that time. Nor is there a fact witness who can alter the reality of what the video reveals or support the allegation that Romero was shot simply due to him exercising his Second Amendment rights. *See ante* at 17 (Thapar & Hermandorfer, JJ., dissenting from the denial of rehearing en banc). Put another way, all seem to agree that this case hinges on the video evidence, yet discovery and even a trial seem inevitable. That line of thinking all but nullifies Rule 12(b)(6) in this setting. After all, if the video here is insufficient to warrant judgment at the pleadings stage, will any video ever suffice?

Perhaps the panel majority simply rejected binding circuit precedent without saying as much. If so, it joins the Tenth Circuit as the lone members of the appellate courts to rule out resolving excessive force cases in a motion to dismiss posture even where video footage fairly describes the events at issue. *See Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1299 (10th Cir. 2025). In *Fuqua*, the Tenth Circuit rejected the "Sixth Circuit rule allowing video evidence at the motion-to-dismiss stage when the video blatantly contradicts the complaint." *Id.* That approach, one regrettably paralleled by the panel majority here, is difficult to rationalize. It asks our minds to reject what our eyes clearly see. And it forces courts to "rely 'on such visible fiction' crafted" by plaintiffs' counsel when we ask whether plaintiffs have plausibly stated a claim. *Id.* at 1308 (Tymkovich, J., dissenting) (quoting *Scott*, 550 U.S. at 381). Given the ubiquity

of excessive force cases that turn on body cam footage or the like, the Supreme Court seemingly would be wise to resolve this split of opinion in the very near future.

To the extent the panel majority appears willing to consider video evidence at this stage, it does so here in a particularly persnickety way, one that is similarly at odds with our precedents. *See Bell*, 37 F.4th at 364. For instance, the panel majority seems to believe it could not resolve the case now based on its assessment that Romero "did his best to tell the officers he meant them no harm" by mumbling the phrase "I got you" in the two seconds between the officers' deployment of their weapons; and that Romero had not yet "point[ed] his gun at" or "advance[d] toward the officers" at the time of the final shots. *Romero*, 159 F.4th at 1010–11, 1013. To be sure, the majority opinion made the most of these modest details, taking an unusually deep dive into both the understanding of the phrase "I got you" as well as Romero's subtle intonations in those fleeting seconds, *see id.* at 1011, before attempting to determine the exact position of Romero's gun at the time of the shooting, *id.* at 1013. Doing so, however, misunderstands the judicial role. As judges, we consider the reasonableness of an officer's conduct through his perspective of the unfolding event, not through any "leisurely stop-action viewing." *Cunningham v. Shelby County*, 994 F.3d 761, 767 (6th Cir. 2021); *Barnes v. Felix*, 145 S. Ct. 1353, 1362 (Kavanaugh, J., concurring) (emphasizing that courts do not "dissect and scrutinize an officer's actions with 20/20 vision of hindsight in the peace of a judge's chambers" (citation modified)). To borrow an analogy from the gridiron, we do not masquerade as football referees engaging in instant replay review— stopping, pausing, and listening a dozen times to capture the extreme nuances of the moment (for instance, did any part of the football cross the goal line?). We sit on the bench, not in the replay booth. In that role, we take the facts displayed in the video in the ordinary sense as would an officer facing the events at hand—no matter the stage of the litigation. *See Rudlaff v. Gillispie*, 791 F.3d 638, 642 (6th Cir. 2015).

A second misstep similarly leaps from the pages of the panel opinion. Preferring to divide the roughly 30-second incident into three separate instances of excessive force, the majority opinion chose to "not dwell on the first two stages of the encounter" and instead "review[ed] . . . the facts" concerning the last moment of the engagement in isolation when considering whether excessive force was employed. *Romero*, 159 F.4th at 1010. But segmenting the use of force

analysis down to the final seconds of the encounter is yesterday's thinking.  By all accounts, slicing the facts in such extreme fashion is in tension with at least two modern Supreme Court precedents. Start with *Plumhoff v. Rickard*, 572 U.S. 765 (2014), which refused to dice up a ten-second police encounter into distinct uses of force.  572 U.S. at 777.  Because officers presented with a "severe threat . . . need not stop shooting until the threat has ended," the Supreme Court demands a fulsome assessment of the events at hand.  *Id.*  And if a 12-year-old precedent does not suffice, how about a seven-month-old one?  Last year's unanimous opinion in *Barnes v. Felix*, 145 S. Ct. 1353 (2025), reinforced the holding in *Plumhoff*, reiterating that the reasonableness of an officer's conduct depends on the totality of circumstances of the entire encounter, not just a particular moment.  145 S. Ct. at 1358 ("[T]he 'totality of the circumstances' inquiry into a use of force has no time limit.").

Yet the panel majority's analysis rises and falls with the "climactic moment" of the encounter.  *Id.* at 1356.  Indeed, the panel majority does not hide the fact that it skipped over the "first two stages of the encounter" to address in detail only what happened in the fleeting moments between the final shots.  *Romero*, 159 F.3d at 1010; *id.* ("First, a brief review of the facts.  After Officers Moore and Kurtz initially fired on Stephen . . . ."); *id.* at 1011 (interpreting at length the words and tone Romero used during the two seconds "between the two rounds of fire"); *id.* at 1012 (focusing on "when officers fired a second round" and emphasizing "[b]y then . . . the situation had become significantly less dangerous").  Absent from the majority opinion's analysis is any assessment of whether the first shots were justified by a "severe threat" that did not immediately and clearly dissipate (thereby justifying the shots that followed just seconds later).  *See Plumhoff*, 572 U.S. at 777; *see also Jones v. Treubig*, 963 F.3d 214, 236 (2d Cir. 2020) (recognizing that when acts of force occur in "rapid succession where there was no reasonable opportunity to re-assess," courts should not artificially "isolate a particular use of force").  *But see Romero*, 159 F.4th at 1014 (asking only whether Romero "remained a threat to the officers" after the first shots).

True, the panel opinion made passing (and often quite generous) characterizations of earlier events in the encounter in responding to the contrary opinions espoused by both the district court and the dissent.  *See, e.g.*, *id.* at 1010, 1013 (asserting that Romero was "largely compliant" and "heeded" earlier officer commands).  But it remains beyond dispute that the majority opinion failed to assess the totality of the circumstances the officers confronted when measuring the legality of

their actions. Case in point, that the officers were attempting to secure the scene of a confirmed shooting and were dealing with a suspect who repeatedly reached for a firearm despite commands to do otherwise is nowhere mentioned in the majority opinion. Again, as *Barnes* and *Plumhoff* command, in excessive force cases we assess a given use of force by considering all relevant circumstances that directly and foreseeably led to an officer's conduct as opposed to "divvy[ing] up shots fired just seconds apart in the heat of a continuous confrontation," as does the majority opinion. *Feagin*, 155 F.4th at 610–12 (applying *Plumhoff* and *Barnes* and refusing to distinguish between separate deployments of a taser, let alone home in on the final seconds of a confrontation); *see*, *e.g.*, *Caraway v. City of Pineville*, 111 F.4th 369, 385 (4th Cir. 2024) (refusing to "parse [a] shooting" lasting only "three or four seconds" into "two distinct phases—the periods before and after he fell to the ground"—and rejecting plaintiff's preferred "frame-by-frame, second-by-second, shot-by-shot" approach).

When viewed through the appropriate lens and with the benefit of the video evidence, this appeal strikes me as relatively simple and one ripe for resolution now. The officers had a blink of an eye to decide why Romero, undeterred by previous gunfire, was continuing to reach for his firearm; they did not have the luxury of waiting to see what Romero would do before firing, and it was not unreasonable for them to respond to Romero's threat in kind. *Romero*, 159 F.4th at 1020 (Griffin, J., concurring in part and dissenting in part). At the very least, the officers were not on notice that their conduct was clearly out of bounds. Indeed, none of the cases the majority opinion cites comes close to describing a situation akin to what the officers were presented with here—two seconds to make a call on whether a suspect reaching for a firearm might use it. *See Lee v. Russ*, 33 F.4th 860, 863 (6th Cir. 2022) (describing a 20 second situation where officers fired on a suspect who had "de-escalate[d]" and was no longer waving a knife); *Bletz v. Gribble*, 641 F.3d 743, 752 (6th Cir. 2011) (recognizing that an officer acts unreasonably when shooting someone who fully complied with the officer's command to lower his weapon). In other words, we have never held that officers who see a suspect reaching for a gun violate the Fourth Amendment by being quicker to the draw. *See ante* at 11–16 (Thapar & Hermandorfer, JJ., dissenting from the denial of rehearing en banc). With no prior case with "facts like the ones at issue here," the majority opinion erred in denying the officers qualified immunity. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam).

*　　*　　*　　*　　*

Given the sharp tension between the panel opinion and Supreme Court precedent (not to mention our own) over a familiar topic across our dockets, I regret that our evenly divided Court declined to rehear this case. *See* Fed. R. App. P. 40(b)(2). After all, *Romero* appears to instruct that whenever two appellate judges "interpret the video differently" than how the defendants do— even as to entirely irrelevant facts such as "what [the plaintiff] intended"—the video fails the "blatant contradiction" test that governs dispositive motion review, *Romero*, 159 F.4th at 1013 (majority opinion), all but eliminating qualified immunity in this setting, *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (recognizing that qualified immunity is "effectively lost" if a case proceeds erroneously to discovery and trial (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985))); *see also Bell*, 37 F.4th at 364 ("If officers are entitled to qualified immunity and don't receive it at the earliest possible stage, then they lose its protections for as long as they continue to litigate"). *Romero* also confirms that old habits die hard. In effect, the majority opinion attempts to resurrect prior precedents that would "hyper-segment" our analysis of excessive force claims bullet by bullet and second by second. *Cf. Feagin*, 155 F.4th at 610–11 (criticizing prior excessive force decisions in light of new Supreme Court precedent); *see also Hart v. Michigan*, 138 F.4th 409, 428 (6th Cir. 2025) (Larsen, J., concurring in part and dissenting in part) (criticizing pre-*Barnes* majority opinion for denying qualified immunity by highlighting the "seconds directly before [the officer's final] use of force" when earlier uses of force did not suffice); *Palma v. Johns*, 27 F.4th 419, 453 (6th Cir. 2022) (Readler, J., dissenting) (criticizing the majority opinion for considering only the "last shots" fired); *Hood v. City of Columbus*, 827 F. App'x 464, 472 (6th Cir. 2020) (Guy, J., concurring in part and dissenting in part) (rejecting majority opinion's approach of segmenting an exchange of gunfire "within a period of approximately five seconds"). Again, the Supreme Court has repeatedly rejected that approach. *See Plumhoff*, 572 U.S. at 777; *Barnes*, 145 S. Ct. at 1358. Simply put, officers need not "perfectly calibrate the amount of force required to protect" themselves and the public. *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007).

I am likewise troubled by *Romero*'s implicit view that the officers erred simply by not waiting long enough to confirm that their target was not "incapacitated." 159 F.4th at 1014. The resulting rule—to wait, say, three or four seconds while a suspect reaches for his gun—puts

officers in impossible situations. *See id.* at 1015 (Griffin, J., concurring in part and dissenting in part); *see also Barnes*, 145 S. Ct. at 1362 (Kavanaugh, J., concurring) (recognizing the realities of policing mean there are often "no easy or risk-free answers" for officers as to when to use force in response to a threat). Embracing the panel majority's "sporting-chance theory" of the Fourth Amendment, one in which suspects get an opportunity to arm themselves again before officers can use force, does a disservice to law enforcement and the public more broadly, to say nothing of the Constitution. *Cf. Lafler v. Cooper*, 566 U.S. 156, 186 (2012) (Scalia, J., dissenting).

In the end, this case can easily be resolved in line with the evidence reflected in the video. Especially when one recognizes that a suspect need not point a firearm at an officer before the officer may respond with deadly force, *Romero*, 159 F.4th at 1011 (majority opinion), the recordings here more than do the job in teeing up the legal question for resolution. So too in many other excessive force cases, with "most" law enforcement encounters now captured by body cams or other recording devices. *See Feagin*, 155 F.4th at 600. Despite today's odd outcome, future panels and the district courts should take the majority opinion at its word, namely, that the video in this case was simply "ambiguous," difficult to interpret, and tantamount to having no video at all, resulting in a case that warranted crediting the allegations that officers shot a plainly incapacitated individual who was merely possessing a firearm. *See Romero*, 159 F.4th at 1013. In the body cam era, this case thus amounts to the exception to the modern rule: In cases where video captures the relevant events, we must resolve those cases at the earliest possible stage rather than neglecting that duty in favor of unnecessary process and delay. *See Pearson*, 555 U.S. at 232 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)); *Bell*, 37 F.4th at 364.

ENTERED BY ORDER OF THE COURT

_____
Kelly L. Stephens, Clerk